

**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 29, 2021**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-42461-ELM |
| ALL SAINTS EPISCOPAL CHURCH, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## <u>MEMORANDUM OPINION</u>

This bankruptcy case is but the latest chapter in a protracted property battle emanating out of the 2008 schism between the Protestant Episcopal Church in the United States of America (the "**Episcopal Church**") and the then-majority of the voting leadership of the Episcopal Diocese of Fort Worth (the "**Fort Worth Diocese**") who, having doctrinal differences with the Episcopal Church, elected to cause the Fort Worth Diocese to terminate its affiliation with the Episcopal Church and thereafter affiliate instead with the Anglican Church in North America (the "**ACNA**"). Naturally, the schism at the diocesan level also led to a splintering of leadership and membership at local parishes, including the parish of All Saints' Episcopal Church of Fort Worth ("**Episcopalian All Saints**"), one of the long-standing Episcopalian parishes in the Fort Worth area. In Episcopalian All Saints' case, a majority of the parish's leaders and members elected to

cause the parish to reject the breakaway movement and remain in union with the Episcopal Church while a minority of the parish's leaders and members elected to follow the breakaway group by terminating their membership with Episcopalian All Saints and then reestablishing as a new unincorporated association in union with the Fort Worth Diocese that they also named All Saints' Episcopal Church (referred to herein as "**ACNA All Saints**").

As a result of the split, a dispute arose between the Episcopal Church and certain local parishes loyal to the Episcopal Church, including Episcopalian All Saints, on the one hand, and the Fort Worth Diocese and certain local parishes loyal to its breakaway leadership, including ACNA All Saints, on the other hand, with respect to, among other things, control of the Corporation of the Episcopal Diocese of Fort Worth (the "**Diocesan Corporation**") and the beneficial ownership of certain property held in trust by the Diocesan Corporation for the benefit of local parishes (the "**Diocesan Trust Property**"). Ultimately, in a judgment of the 141st District Court of Tarrant County, Texas (the "**State Court**") that was later upheld by the Texas Supreme Court in 2020 (the "**State Court Judgment**"), the Fort Worth Diocese and local parishes that followed the breakaway leadership of the Fort Worth Diocese were successful in establishing that, under neutral principles of law, the Fort Worth Diocese and the Diocesan Corporation validly separated from the Episcopal Church and that in accordance with governing trust provisions of the Diocesan Corporation's organizational documents, the Diocesan Trust Property was held in trust by the Diocesan Corporation for the benefit of only those parishes in union with the Fort Worth Diocese, including ACNA All Saints. Once the United States Supreme Court declined to review the Texas Supreme Court's decision, the Fort Worth Diocese, the Diocesan Corporation, and parties aligned with them pursued enforcement of the State Court Judgment, successfully

obtaining, among other things, possession of the church building that Episcopalian All Saints had used for years.

The outcome of the diocesan-level litigation coupled with the parish-level split that occurred within Episcopalian All Saints has now led to a new dispute with respect to the control of a separate Texas non-profit corporation also named All Saints Episcopal Church (hereafter, the "**Debtor**"), the chapter 11 debtor in this case. In this regard, in early October 2021, the Diocesan Corporation sent a letter to Frost Bank, the Debtor's bank, to claim control of the Debtor's Frost Bank accounts pursuant to the State Court Judgment and a post-judgment enforcement order of the State Court. In reaction to the demand, Frost Bank froze all of the Debtor's accounts. Unable to access the accounts and facing the prospect of having certain Episcopalian All Saints donor funds seized, the putative board of directors of the Debtor authorized the Debtor to pursue chapter 11 bankruptcy relief and on October 20, 2021, the Debtor initiated this case with the filing of its voluntary petition for such relief.

On November 4, 2021, the Diocesan Corporation and ACNA All Saints (together, the "**Movants**") filed a joint *Motion to Dismiss* [Docket No. 46] (the "**Motion**"), arguing that the bankruptcy case must be dismissed because it was never authorized by the "legitimate" members of the Debtor's board of directors – being those individuals purportedly elected by the members of ACNA All Saints, the All Saints' Episcopal Church association that the State Court allegedly determined to be the one and only legally-recognized All Saints' Episcopal Church association. In opposition to the Motion, the Debtor – under the control of the board elected by members of Episcopalian All Saints – has filed the *Debtor's Response to Motion to Dismiss* [Docket No. 76] (the "**Response**"), asserting that its board was duly and legally elected in accordance with the governing organizational documents of the Debtor and that the filing was duly authorized by such

board, to which the Movants have filed their *Reply to Debtor's Response to Motion to Dismiss* [Docket No. 79] (the "**Reply**").

On November 30, 2021, the Court conducted an evidentiary hearing on the Motion.  Having considered the Motion, the Response, the Reply, the evidence presented, and the representations and arguments of counsel, on December 15, 2021, the Court entered an *Order Denying Motion to Dismiss* [Docket No. 97] (the "**Dismissal Denial Order**").  The Court now issues this Memorandum Opinion to detail the reasons for the Dismissal Denial Order.

## *JURISDICTION*

The Court has jurisdiction of the proceeding involving the Motion pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409.  The proceeding is core in nature within the meaning of 28 U.S.C. § 157(b)(2)(A).

## *FACTUAL BACKGROUND*

The Episcopal Church in the United States, founded in 1789, is a three-tiered religious organization.  The highest tier of the organization is the General Convention, which consists of most of the bishops of the Episcopal Church and representatives from each Episcopal regional diocese.  The General Convention, which is akin to the legislative body of the Episcopal Church, has the authority to, among other things, adopt and periodically amend the Episcopal Church's governing constitution and canons.  The second tier of the organization is comprised of geographically defined regional dioceses.  Each diocese elects a bishop to oversee the diocese, who must pledge to perform in conformity with the Episcopal Church's ecclesiastical regulations, and each diocese is governed by its own diocesan convention, which is comprised of the diocesan

bishop and clergy and certain designated lay representatives from each of the local parishes, missions and congregations in union with the diocese and Episcopal Church. Similar to the General Convention, a diocesan convention has the authority to, among other things, adopt and periodically amend its own constitution and canons, but each diocesan constitution and set of canons must accede to the General Convention's constitution and canons. Finally, the third tier of the Episcopal Church is comprised of local parishes, missions and congregations in union with the particular regional diocese and the Episcopal Church, each of which must conform their operations to both the constitution and canons of the applicable regional diocese and the constitution and canons of the General Convention.[1]

### A. *The Origin of Episcopalian All Saints, the Debtor, the Fort Worth Diocese and the Diocesan Corporation*

Episcopalian All Saints has existed since the late 1940s. When first organized, it was affiliated with the Episcopal Diocese of Dallas (the "**Dallas Diocese**"). In early 1953, the members of Episcopalian All Saints determined to organize a non-profit corporation to facilitate its operations. Accordingly, on March 30, 1953, the Debtor was incorporated as a Texas non-profit religious corporation.[2] Pursuant to the Debtor's Articles of Incorporation ("**Articles**"):

The purpose for which the corporation is formed is religious; that is to say, to associate ourselves together for the purpose of maintaining the worship of God and

---

[1] *See generally Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 420-21 (Tex. 2020), *cert. denied*, 141 S. Ct. 1373 (2021) [hereafter referred to as "***Episcopal Church II***"] (admitted into evidence as Movants' Exh. 1); *see also* Debtor's Exh. 20, ¶ 10 (Declaration of Rev. Christopher N. Jambor).

[2] *See* Debtor's Exh. 2 (Debtor's Articles of Incorporation). While neither counsel for the Movants nor counsel for the Debtor raised the issue at the hearing, of significance, the Articles provide for the Debtor to have a lifespan of 50 years – thus, until March 29, 2003. *See* Articles (art. IV). With that in mind, it does not appear as though any evidence of an amendment to the Articles to extend the term of the Debtor was introduced at the hearing. *See also* Debtor's Exh. 12 (listing of all organizational filings with the Texas Secretary of State involving the Debtor through November 10, 2021). Thus, if, in fact, the Articles were never amended to extend the Debtor's term, then the Debtor's only authorized course of action moving forward will be to wind up its business affairs in accordance with applicable Texas law. *See, e.g.,* Tex. Bus. Org. Code §§ 11.051(1) and 11.052(a). While that may have serious implications with respect to the direction of this case, it does not, in and of itself, dictate the outcome of the Motion before the Court given the narrow basis for dismissal presented. *See, e.g.,* Tex. Bus. Org. Code §§ 11.052(b) and 11.055 (authorizing the prosecution and defense of any civil or other court action during the winding up process).

the preaching of the Gospel according to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America in conformity with the Constitution and Canons of its General Convention and of the Diocese of Dallas, and to have all the powers and privileges and to be subject to all the restrictions contained in [the then-applicable Texas statutory provisions governing non-profit religious corporations[3]].

Articles (art. II).

In 1982, the Dallas Diocese voted to divide into a Dallas diocese and Fort Worth diocese. Thus, in conformity with the constitution and canons of the Episcopal Church, the Fort Worth Diocese was organized as an unincorporated association.[4]  At the initial November 1982 convention of the Fort Worth Diocese, the convention adopted a constitution (the "**Diocesan Constitution**") and canons (the "**Diocesan Canons**"), both effective January 1, 1983, which, among other things, acceded to the authority of the constitution and canons of the General Convention of the Episcopal Church.[5]  In December 1982, the General Convention of the Episcopal Church admitted the Fort Worth Diocese into union with the Episcopal Church.[6]  As a result of the establishment of the Fort Worth Diocese, Episcopalian All Saints became a parish of the Fort Worth Diocese.

Pursuant to the Diocesan Constitution, "church property 'acquired for the use of a particular Parish or Mission' [is to] be held by the Corporation of the Episcopal Diocese of Fort Worth (the Diocesan Corporation) 'in trust for the use and benefit of such Parish or Mission' that is in union with the diocese's convention…."[7]  With that in mind, the Fort Worth Diocese

---

[3] Specifically referring to title 32, chapter 9, of the Revised Civil Statutes of the State of Texas, which has since been superseded by applicable provisions of titles 1 and 2 (including chapter 22) of the Texas Business Organizations Code.

[4] *See Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 648 (Tex. 2013) [hereafter referred to as "***Episcopal Church I***"] (admitted into evidence as Movants' Exh. 8).

[5] *See* Movants' Exh. 13 (included copies of the amended versions of the Diocesan Constitution and Diocesan Canons).

[6] *Episcopal Church I*, 422 S.W.3d at 648.

[7] *Episcopal Church II*, 602 S.W.3d at 421.

organized the Diocesan Corporation in February 1983 to hold the Diocesan Trust Property and "[c]onsistent with the Diocesan Constitution and Canons, the articles of incorporation [of the Diocesan Corporation] required the corporation to administer [the] trust property 'in accordance with the Constitution and Canons of the [Fort Worth Diocese] as they now exist or as they may hereafter be amended.'"[8] Following the incorporation of the Diocesan Corporation, the Dallas and Fort Worth Dioceses initiated a friendly lawsuit in Dallas County to obtain entry of a judgment (which was entered in 1984) transferring part of the Dallas Diocese's real and personal property to the Fort Worth Diocese, with legal title (with a few exceptions) to be vested in the Diocesan Corporation subject to its governing trust provisions.[9]

## B.    *Governance of the Debtor*

Turning to the Debtor, pursuant to the Debtor's Articles, the organizing members of the Debtor – being members of Episcopalian All Saints – elected to provide for the Debtor's management by a board of directors with the number of directors to be determined by the Debtor's bylaws (subject to a minimum of three and a maximum of fifteen members).  An initial slate of twelve directors was appointed pursuant to the Articles.[10]

At the 54th annual Episcopalian All Saints parish meeting, the members of Episcopalian All Saints adopted updated bylaws for the Debtor, dated January 21, 2001 (the "**2001 Bylaws**").[11] The 2001 Bylaws were in force at the time of the schism.[12]  Consistent with the Articles, the 2001

---

[8] *Id*. at 422.

[9] *See Episcopal Church I*, 422 S.W.3d at 648.

[10] *See* Articles (art. V).

[11] *See* Debtor's Exh. 3 (2001 Bylaws).

[12] In 2011 and 2012, the members and Vestry of Episcopalian All Saints approved certain amendments to the 2001 Bylaws to, among other things, provide clarity with respect to its continuing affiliation with the Episcopal Church. *See* Debtor's Exhs. 9 and 10; *see also* Debtor's Exh. 1, ¶ 22 (Rev. Jambor Declaration).  None of the amendments materially changed the 2001 Bylaws' provisions with respect to the composition, election or terms of office of the

Bylaws provide for the Debtor to be managed by a board of directors, referred to as the "Vestry" therein (and, thus, also referred to as the Vestry herein).[13]  Article III of the 2001 Bylaws sets out provisions governing the composition, election and terms of office of the Vestry.  Among other things, the Vestry is to consist of no less than six and no more than fifteen members, each of whom is to serve a three-year term.  The election of members of the Vestry is to occur on an annual basis at the annual Episcopalian All Saints parish meeting with the elections to be staggered among three Vestry classes of approximate equal size.[14]

Under the 2001 Bylaws, those entitled to vote on the election of Vestry members are those members of the Debtor (being "those who from time to time are the Communicants in Good Standing of All Saints' Episcopal Church, as listed on its communicant rolls in accordance with the General Convention and Diocesan Canons"[15]) who are at least 16 years of age.[16]  For purposes of taking a vote, ten percent (10%) of the qualified voters in the parish constitutes a quorum.[17]  If a vacancy in the membership of the Vestry occurs between annual parish meetings, then the remaining members of the Vestry are authorized to elect a new member to fill the vacant spot

Vestry (the Debtor's bylaws in force at any given time during the time period relevant to this dispute are simply referred to herein as the "**Bylaws**").

[13] *See* 2001 Bylaws (art. III); *see also id.* (art. IV, § A) (duty of the President/Rector to "see that all orders and resolutions of the Vestry are carried into effect"); Tex. Bus. Org. Code §§ 22.201 and 22.202(b) (providing for the affairs of a non-profit corporation incorporated prior to 1994 to be managed by a board of directors in the absence of a provision in the certificate of formation providing for management to be vested in the members, or in the case of a church organized as a corporation, an established congregational system that has the corporation's management vested in the members, neither of which is applicable here).

[14] *See* 2001 Bylaws (art. III, § A).

[15] *See id.* (art. VI, § A); *see also* Articles (art. VI) (providing that the members of the corporation "shall be those who, from time to time, are the Communicants of All Saints Episcopal Church of Fort Worth, Tarrant County, Texas, according to its Communicant Rolls").

[16] *See* 2001 Bylaws (art. VI, § B).

[17] *See id.*

through the end of the unexpired term.[18] In each case, members of the Vestry are to be elected "from Confirmed Communicants [of Episcopalian All Saints] in Good Standing."[19]

With respect to actions of the Vestry, the 2001 Bylaws provide that a majority of the Vestry constitutes a quorum for purposes of conducting business and contemplates the Vestry's approval of any action by a majority vote of those present (whether in person or by proxy).[20] The Vestry may also approve any action by unanimous written consent.[21] The only limiting language within the 2001 Bylaws with respect to the Vestry's authority is in article II of the 2001 Bylaws (titled "Governance"), which provides:

> The affairs of the Corporation shall be conducted in conformity to the Constitution and Canons of the General Convention of the Episcopal Church in the United States of America (hereinafter referred to as "General Convention Canons" and "The Episcopal Church", respectively). The affairs of the Corporation shall likewise be conducted in conformity with the Constitution and Canons of the Diocese of Fort Worth (hereinafter referred to as the "Diocesan Canons"); provided in the event of any conflict between the General Convention Canons and either the Diocesan Canons or these Bylaws, as they relate to the affairs of the Corporation, the General Convention Canons shall prevail, to the extent of such conflict.

2001 Bylaws (art. II).

## C. The Fort Worth Diocese's and Diocesan Corporation's Breakaway from the Episcopal Church

For over two decades, the Fort Worth Diocese remained in union with the Episcopal Church. By 2006, however, unresolved doctrinal differences between the General Convention of

---

[18] *See id.* (art. III, § A).

[19] *See id.* Communicants in "Good Standing" are those communicants of Episcopalian All Saints who, for the previous year, "have been faithful in working, praying and giving for the spread of the Kingdom of God." *Id.* (art. VI, § A).

[20] *See id.* (art. III, § B) (providing for a majority of the Vestry to constitute a quorum and for each member of the Vestry to have a vote, with the Rector having the right to cast the deciding vote in the event of a tie); *see also* Tex. Bus. Org. Code § 22.214 ("The act of a majority of the directors present in person or by proxy at a meeting at which a quorum is present at the time of the act is the act of the board of directors of a corporation, unless the act of a greater number is required by the certificate of formation or bylaws of the corporation").

[21] *See* 2001 Bylaws (art. III, § C).

the Episcopal Church and a majority of the leadership of the Fort Worth Diocese set off a series of events culminating in a schism between the Episcopal Church and the Fort Worth Diocese and Diocesan Corporation.

Initially, in 2006, those eligible to vote on matters of corporate governance with respect to the Diocesan Corporation voted to amend the Diocesan Corporation's articles of incorporation and bylaws to remove all references to the Episcopal Church.[22] Thereafter, at the November 2007 and 2008 conventions of the Fort Worth Diocese, a majority of the voting delegates, led by then-Bishop Jack Iker, voted to cause the Fort Worth Diocese to withdraw from its union with the Episcopal Church and to amend the Diocesan Constitution and Canons to remove all reference to the Episcopal Church.[23] Per Bishop Iker, as of November 2008, the Fort Worth Diocese was no longer affiliated with the Episcopal Church, and he was no longer a bishop (or even a member) of the Episcopal Church.[24] The convention of the Fort Worth Diocese would later cause the Fort Worth Diocese to affiliate with the ACNA.[25]

In December 2008, the Episcopal Church accepted Bishop Iker's renunciation and removed him from all positions of authority within the church.[26] Shortly thereafter, treating those of the diocesan leadership who voted to cause the Fort Worth Diocese to dissociate from the Episcopal Church as having contemporaneously vacated their official positions with the Fort Worth Diocese and Diocesan Corporation, and treating all organizational document amendments purporting to

---

[22] *Episcopal Church II*, 602 S.W.3d at 422.

[23] *See id*. at 423; *see also, e.g.*, Movants' Exh. 13 (included copy of the Diocesan Constitution, art. 1 (as revised November 2008 to remove any reference to the Fort Worth Diocese's affiliation with the Episcopal Church)).

[24] *See* Debtor's Exh. 14, at pp.25-26 and 28 (Bishop Iker deposition).

[25] *See* Debtor's Exh. 14, at p.12 (Bishop Iker deposition). It appears that for a short period of time prior to its affiliation with the ACNA, however, the Fort Worth Diocese affiliated (or attempted to affiliate) with the Anglican Province of the Southern Cone. *See Episcopal Church II*, 602 S.W.3d at 423.

[26] *Episcopal Church II*, 602 S.W.3d at 423.

sever ties with the Episcopal Church as void *ab initio*, the Episcopal Church convened a special convention of the loyal faction of the diocese leadership to fill the offices so "vacated" and retake control of the diocesan entities.[27]  Applying neutral principles of law, however, the State Court would later find such efforts to be ineffective under the organizational documents of the diocesan entities.[28]

### D.     The Impact of the Schism on Episcopalian All Saints and the Debtor

Naturally, the vote of the convention of the Fort Worth Diocese to break away from the Episcopal Church triggered corresponding rifts within local parishes, including Episcopalian All Saints.  Each of the parishes would need to decide whether to remain loyal to the Episcopal Church or to follow the Fort Worth Diocese under the breakaway leadership of Bishop Iker.

As of this time frame, in late 2008, Episcopalian All Saints had approximately 2,000 members on its membership rolls.[29]  The vast majority of such members elected to continue their membership with Episcopalian All Saints under the leadership of its existing Rector, Reverend Christopher Jambor, and to cause Episcopalian All Saints to remain in union with the Episcopal Church.[30]  In light of such decision, others decided to leave Episcopalian All Saints to follow the breakaway group led by Bishop Iker.  More specifically, a total of 184 of the roughly 2,000 Episcopalian All Saints parishioners decided to either transfer out of the congregation to a different congregation or ask to be removed from the parish's membership registers.[31]  Of the 184 who

---

[27] *See id*.

[28] *See id*. at 426-33.

[29] *See* Debtor's Exh. 16, at p. 68 (William Brackett deposition).

[30] *See* Debtor's Exh. 15, at pp. 13, 28 (Bishop Ryan Reed deposition).

[31] *See* Debtor's Exh. 1, ¶ 16 (Rev. Jambor Declaration).

departed, approximately 168 ultimately followed the breakaway group of the Fort Worth Diocese under the leadership of Bishop Iker.[32]

As for the impact of such split on the Debtor, following the schism, the vast majority of the Debtor's Vestry similarly elected to remain with the Debtor. Others, however, elected to resign from the Debtor's Vestry given the Debtor's and Episcopalian All Saints' continuing alignment with the Episcopal Church.[33] In this regard, as of November 2008, prior to the schism, the Debtor had a fifteen-member Vestry with fourteen of the positions filled.[34] In December 2008, following the schism at the diocesan level, three of the members of the Debtor's Vestry elected to resign.[35] The remaining members of the Vestry elected replacement Vestry members to fill the positions for the remainder of their respective terms.[36] Thereafter, at the January 2009 annual Episcopalian All Saints parish meeting, an election to fill all open spots on the Vestry was conducted, at which time all open spots were filled in accordance with the 2001 Bylaws, thereby returning the active number of Vestry members to fifteen.[37] In late January 2009, however, two additional Vestry members resigned.[38] In accordance with the 2001 Bylaws, the remaining members of the Vestry elected replacement Vestry members to fill these open spots in April 2009.[39]

---

[32] Debtor's Exh. 15, at p.10 (Bishop Ryan Reed deposition) (referencing a total of 168 of the Episcopalian All Saints parishioners who elected to leave the parish per the journal records of the 2009 Fort Worth Diocese convention).

[33] *See* Debtor's Exh. 16, at p.16 (Brackett deposition).

[34] *See* Debtor's Exh. 1, ¶ 10 (Rev. Jambor Declaration). Prior to November 2008, one of the fifteen Vestry members had resigned to join the Rector's staff. Inasmuch as the vacant position would be up for election at the January 2009 annual Episcopalian All Saints parish meeting, the remaining members of the Vestry elected to not fill the position prior to the annual parish meeting. *See id.*, ¶ 10 n.10.

[35] *See* Debtor's Exh. 1, ¶ 11 (Rev. Jambor Declaration); Debtor's Exh. 4 (documentation reflecting resignations).

[36] *See* Debtor's Exh. 1, ¶ 11 (Rev. Jambor Declaration); Debtor's Exh. 5 (minutes of 1/20/2009 Vestry meeting evidencing the replacement election vote).

[37] *See* Debtor's Exh. 1, ¶¶ 12-13 (Rev. Jambor Declaration); Debtor's Exh. 6 (minutes of 1/25/2009 Episcopalian All Saints annual parish meeting).

[38] *See* Debtor's Exh. 7 (documentation reflecting resignations).

[39] *See* Debtor's Exh. 1, ¶¶ 14-15 (Rev. Jambor Declaration).

Thus, ultimately, only five of the Debtor's fifteen-member Vestry resigned,[40] and each of the vacancies was filled in accordance with the 2001 Bylaws. Thereafter, through the date of the Debtor's bankruptcy filing, members of the Debtor's Vestry were elected at annual Episcopalian All Saints parish meetings (or, in one case, by the remaining members of the Vestry upon the resignation of a member who moved out of state) in accordance with the Bylaws.[41]

### E.    *Jockeying for Control of Diocesan Trust Property*

Significantly, for parishes like Episcopalian All Saints that elected to remain loyal to the Episcopal Church, a serious issue arose with respect to the continuing right to use Diocesan Trust Property historically committed to their use. In this regard, both the Diocesan Constitution and the governing documents of the Diocesan Corporation contemplated that the Diocesan Trust Property would be held in trust for those parishes for whom the property was acquired *who were in union with the Fort Worth Diocese*.[42] But what if such a parish fell out of union with the Fort Worth Diocese? Would its beneficial interest in Diocesan Trust Property suddenly evaporate? In the case of Episcopalian All Saints, for example, following the split, it no longer considered itself to be affiliated with the Fort Worth Diocese – at least, not to the extent that it remained under the oversight of Bishop Iker.[43] Did it matter that, as of the time of the split, Episcopalian All Saints was the only All Saints' Episcopal Church of Fort Worth that existed for purposes of the trust provisions of the Diocesan Corporation?

No doubt appreciating the implications of these types of questions, a strategic decision was made by the breakaway diocesan leadership and departed Episcopalian All Saints members to have

---

[40] *See* Debtor's Exh. 15, at p.18-19 (Bishop Reed deposition).

[41] *See* Debtor's Exh. 1, ¶ 17 (Rev. Jambor Declaration); Debtor's Exh. 8 (history of Vestry membership from 2009 to present).

[42] *Episcopal Church II*, 602 S.W.3d at 421.

[43] *See* Movants' Exh. 10, at pp.72-73 (Rev. Jambor deposition).

the ex-members of Episcopalian All Saints simply reorganize as a new unincorporated religious association that would also be named "All Saints' Episcopal Church" – except that this new All Saints' Episcopal Church association (referred to herein as ACNA All Saints) would be the only All Saints' Episcopal Church association considered to be in union with the Fort Worth Diocese.[44] That way, the argument could be made that ACNA All Saints constituted the only beneficiary of the Diocesan Trust Property designated for use by the "All Saints' Episcopal Church" parish *in union with the Fort Worth Diocese*.

Notwithstanding its use of the "All Saints' Episcopal Church" name, ACNA All Saints, headed by Reverend Bill O'Connell, a priest appointed by Bishop Iker to oversee the congregation,[45] was and is different and distinct from both Episcopalian All Saints and the Debtor, both of whom were and are in fact, and not just in name, affiliated with the Episcopal Church.[46] Among other things, ACNA All Saints gathered for services at a location different from the church at which Episcopalian All Saints congregated.[47] And members of ACNA All Saints considered themselves to have no connection to Episcopalian All Saints which, in their view, had broken away from the Fort Worth Diocese and Bishop Iker.[48] Nevertheless, to keep up the façade, ACNA All Saints began to conduct business in a manner similar to Episcopalian All Saints – most notably,

---

[44] *See, e.g.*, Movants' Exh. 25 (carefully worded letter from members of the newly appointed vestry of ACNA All Saints to Rev. Jambor of Episcopalian All Saints claiming to "remain constituent members of All Saints' Episcopal Church, Fort Worth, *in the Episcopal Diocese of Fort Worth*") (emphasis added).

[45] *See* Debtor's Exh. 13, at p.21 (Rev. Darryl Pigeon deposition).

[46] Indeed, ACNA All Saints' use of the "All Saints' Episcopal Church" name is an obvious misnomer give that ACNA All Saints (as well as the Fort Worth Diocese to which it pledged fidelity) expressly disclaimed any affiliation with the Episcopal Church. *See, e.g.*, Debtor's Exh. 16, at pp. 54-55 (Brackett deposition) (confirming that the members of ACNA All Saints are Anglicans, not Episcopalians); Debtor's Exh. 13, at p.35 (Rev. Pigeon deposition) (current rector of ACNA All Saints, acknowledging that he has no affiliation with the Episcopal Church); Debtor's Exh. 14, at pp.29-30 (Bishop Iker deposition) (acknowledging that those who followed the post-schism Fort Worth Diocese were no longer a part of the Episcopal Church).

[47] *See* Debtor's Exh. 13, at p.14 (Rev. Pigeon deposition).

[48] *See, e.g.*, Movants' Exh. 11, ¶ 3 (Declaration of Rev. Darryl Pigeon).

purporting to elect its own vestry at annual ACNA All Saints parish meetings in accordance with the terms of the Debtor's 2001 Bylaws.[49]

## F.      The Diocesan Trust Property Litigation

On April 14, 2009, the Episcopal Church and certain parties affiliated with the Episcopal Church commenced litigation in the State Court against the breakaway leadership of the Fort Worth Diocese and Diocesan Corporation and certain parties affiliated with them to pursue recovery of the Diocesan Trust Property.[50] Parties to the litigation[51] would also eventually include the Fort Worth Diocese, the Diocesan Corporation, Episcopalian All Saints and ACNA All Saints. As finally aligned, the plaintiffs to the litigation were the Episcopal Church and certain other parties aligned with the Episcopal Church, including Episcopalian All Saints (collectively, the "**State Court Plaintiffs**"), and the defendants to the litigation were the Fort Worth Diocese, the Diocesan Corporation, Bishop Iker and the breakaway leadership led by him, and certain other parties aligned with them, including ACNA All Saints (collectively, the "**State Court Defendants**"). The Debtor, itself, was never a party to the litigation.

---

[49] *See id*., ¶ 5; *see also* Movants' Exhs. 13 and 14 (ACNA All Saints 2010 and 2011 parish and vestry minutes). Of course, ACNA All Saints did not truly conduct its business in accordance with the 2001 Bylaws, or at least not *all* of the 2001 Bylaws. Among other things, ACNA All Saints (an association as opposed to a corporation), having purposefully separated itself from the Episcopal Church, never operated in conformity with the constitution and canons of the General Convention of the Episcopal Church. Yet, article II of the 2001 Bylaws provides that "[t]he affairs of the *Corporation* shall be conducted *in conformity to the Constitution and Canons of the General Convention of the Episcopal Church in the United States*"). *See* 2001 Bylaws, art. II (emphasis added). Plus, those eligible to vote at vestry elections are communicants in good standing of All Saints' Episcopal Church "as listed on its communicant rolls *in accordance with the General Convention*" (and also Diocesan Canons, but pursuant to article II of the 2001 Bylaws, the constitution and canons of the General Convention control in the event of any conflict between the Diocesan Canons and the constitution and canons of the General Convention of the Episcopal Church). *See id*., arts. II and VI.

[50] *See Episcopal Church II*, 602 S.W.3d at 423.

[51] The litigation in the State Court would eventually include two different cases – an original 2009 case under Cause No. 141-237105-09, and a subsequent 2011 case under Cause No. 141-252083-11. The evidence presented by the parties fails to explain why two different cases existed and how they relate to one another. In argument, counsel did not provide any clarity on the matter. The final State Court Judgment was entered in Cause No. 141-252083-11.

The issues in dispute in the litigation were whether the Fort Worth Diocese and Diocesan Corporation ever permissibility terminated their relationship with the Episcopal Church, who rightfully controlled the Fort Worth Diocese and the Diocesan Corporation, and which parishes were the beneficial owners of the Diocesan Trust Property.[52] Ultimately, applying neutral principles of law, the State Court determined that the organizational documents of the Fort Worth Diocese and the Diocesan Corporation had been validly amended to cause each of the entities to legally sever ties with the Episcopal Church, that the Fort Worth Diocese and the Diocesan Corporation remained under the control of the breakaway leadership team led by Bishop Iker and their successors, and that, in accordance with the governing trust provisions of the Diocesan Corporation's organizational documents, the Diocesan Trust Property was held in trust by the Diocesan Corporation for the benefit of parishes in union with the Fort Worth Diocese, including ACNA All Saints (but not Episcopalian All Saints). On July 24, 2015, the State Court entered the State Court Judgment,[53] later upheld on appeal by the Texas Supreme Court.[54]

## G.    Post-Judgment Efforts to Enforce the State Court Judgment; Actions Taken Against the Debtor; and the Bankruptcy Filing

Pursuant to the State Court Judgment, the State Court Plaintiffs were ordered to surrender possession of certain Diocesan Trust Property listed on Exhibits 1 and 2 thereto (specifically-identified tracts of real property, endowments and pledged funds) to the State Court Defendants.[55] While, the State Court Judgment is silent with respect to personal property, outside of the

---

[52] See Movants' Exh. 20 (Sixth Amended Original Petition filed in the litigation); see also, e.g., Movants' Exh. 23 (excerpts of arguments at summary judgment hearing with respect to whether Episcopalian All Saints or ACNA All Saints was the All Saints' Episcopal Church that held beneficial ownership to certain Diocesan Trust Property held in trust for the All Saints' Episcopal Church parish).

[53] See Movants' Exh. 2 (State Court Judgment).

[54] See Episcopal Church II, 602 S.W.3d at 435-36.

[55] See State Court Judgment, at p.2.

specifically-identified endowments and pledged funds, ostensibly the State Court (with the express agreement of the parties) clarified the scope of the property at issue under the State Court Judgment in an Agreed Supersedeas Order entered on August 3, 2015. In relevant part (as applicable to Episcopalian All Saints), the Agreed Supersedeas Order provided:

> The property made subject of this lawsuit that is in [the State Court Plaintiffs'] possession (the "Property") is hereby defined to mean only the parcels identified at the following entries to the list of properties labeled "Exhibit 1" in the July 24, 2015 [State Court Judgment], the endowments and funds listed in "Exhibit 2" of the [State Court Judgment], any real or personal property obtained with proceeds from the properties/endowments/funds listed in "Exhibits 1 and 2" of the [State Court Judgment], and personal property necessary for the operation of the Episcopal Parish or Mission associated with that parcel (*i.e.* chalices, vestments, bibles, etc.): . . .
>
> •  Entries 13 and 14 (All Saints' Episcopal Church (Fort Worth)).
>
> In no event shall the Property be defined to include the four properties to which [the State Court Defendants] waived any claim in Defendants' Third Motion for Partial Summary Judgment Relating to All Saints' Episcopal Church, filed May 6, 2015. [The State Court Defendants] waived all claim to the property of All Saints' Episcopal Church (Fort Worth) at 4939 Dexter Ave. (JA02535), 5001 Dexter Ave. (JA02540), 4936 Dexter Ave. (JA02537), and 5005 Dexter (JA02532). In no event shall the Property be defined to include any property over which [the State Court Defendants] have never asserted a claim in this action….

Movants' Exh. 19 (Exhibit F (Agreed Supersedeas Order, at p.2 n.1) to State Court Defendants' Second Amended Motion to Enforce Judgment and Rule 11 Agreements).[56]

That said, the State Court Judgment, itself, was never actually amended. Thus, once the State Court Judgment had become final and no longer appealable, a dispute arose between the State Court Plaintiffs and the State Court Defendants with respect to whether the State Court Judgment required the State Court Plaintiffs to turn over any personal property other than the specifically described endowments and pledged funds listed on Exhibit 2 to the State Court

---

[56] *See* Movants' Exh. 19 (Exhibit E (Rule 11 Agreement, at p.2 n.1)) (identifying the same "Property").

Judgment.[57]    Successfully convincing the State Court that it did, the State Court Defendants obtained entry of an order (the "**Judgment Enforcement Order**") requiring the State Court Plaintiffs "to immediately deliver, as required by the [State Court Judgment], possession of all real and personal property, in existence at the time the [litigation] was filed on April 14, 2009, including all personal property necessary for the operations of the properties listed in the [State Court Judgment] … as well as all financial assets that supported or enabled the operations…."[58]

Armed with the new Judgment Enforcement Order, the State Court Defendants have no longer limited their execution efforts to the personal property described as the "property made the subject of this lawsuit" in the Agreed Supersedeas Order.  Instead, they expanded their execution efforts to *all* property within the possession of the State Court Plaintiffs, including, as relevant to members of Episcopalian All Saints, property owned by the Debtor even though the Debtor was never a party to the litigation.  The attack has commenced on multiple fronts.  First, on September 29, 2021, ACNA All Saints and the Diocesan Corporation filed suit against Episcopalian All Saints and the Debtor in the 17th Judicial District Court of Tarrant County, Texas, to, among other things, pursue the recovery of property of the Debtor (including, remarkably, property to which the State Court Defendants expressly waived any claim to in the litigation) on the alleged basis of the State Court Judgment and Judgment Enforcement Order.[59]    Then, roughly one week later, on October 7, 2021, the Diocesan Corporation sent a letter to Frost Bank, the Debtor's bank, in an effort to seize control of the Debtor's bank accounts.  In the letter, the Diocesan Corporation represented that, per the State Court Judgment and Judgment Enforcement Order, it "has been awarded control

---

[57] *See, e.g.*, Movants' Exh. 19 (State Court Defendants' Second Amended Motion to Enforce Judgment and Rule 11 Agreements).

[58] *See* Movants' Exh. 16.

[59] *See* Debtor's Exh. 20, ¶ 30 and exh. 9 thereto (Rev. Jambor Declaration and copy of Original Petition in 17th Judicial District Court).

of all property; real, personal and financial for the following DBA entities: … All Saints, Fort Worth."[60] Based upon the Diocesan Corporation's representations and demand, Frost Bank placed an indefinite hold/freeze on all of the Debtor's accounts on October 15, 2021.[61] Finally, on October 15, 2021, the State Court Defendants filed a new motion with the State Court to seek, among other things, the entry of an order (a) requiring Episcopalian All Saints and certain other State Court Plaintiffs to deliver to the Diocesan Corporation "all financial statements and audits and bank statements from January of 2009 to the latest record" and (b) directing the same State Court Plaintiffs to "authorize each financial institution holding funds in the accounts identified in [the requested] order to deliver those funds by cashier's check payable to [the Diocesan Corporation]."[62] Per the motion, only if the Diocesan Corporation should thereafter determine that any of the funds received belong to a State Court Plaintiff will the funds be delivered back to the State Court Plaintiff.[63]

Given the inability of the Debtor to access any of its accounts, facing the prospect of having certain Episcopalian All Saints donor funds seized, and being confronted with the barrage of litigation attacks, the Vestry of the Debtor elected by the Episcopalian All Saints members voted on October 19, 2021 to authorize the Debtor's filing of a petition for relief under chapter 11 of the Bankruptcy Code.[64] On October 20, 2021, a petition for chapter 11 relief was filed on behalf of the Debtor in accordance with such authorization.

---

[60] *See* Debtor's Exh. 20, ¶ 31 and Exh. 10 (Rev. Jambor Declaration and copy of 10/7/2021 Frost Bank letter).

[61] *See id.*

[62] *See* Movants' Exh. 24, at p.2.

[63] *See id.*

[64] *See* Debtor's Exh. 1, ¶ 24 (Rev. Jambor Declaration); Debtor's exh. 11 thereto (executed resolution of the Debtor's Vestry documenting such authorization).

**H.** **The Diocesan Entities' and ACNA All Saints' Latest Strategy
With Respect to the Debtor**

The Movants now assert that ACNA All Saints lawfully controls the Debtor and that the vestry of ACNA All Saints never authorized the bankruptcy filing. While it is undisputed that the vestry of ACNA All Saints never authorized the filing,[65] the assertion with respect to ACNA All Saints' control of the Debtor is new. Previously, for example, representatives of ACNA All Saints acknowledged that no action, or attempted or purported action, had ever been taken by the members of ACNA All Saints to remove any of the members of the Debtor's Vestry.[66] And in 2015, the designated representative of ACNA All Saints for deposition purposes testified that ACNA All Saints was making no claim to control of the Debtor.[67] Now, however, in 2021, the leadership of ACNA All Saints and the Fort Worth Diocese take the position that once the bishop of the Fort Worth Diocese no longer recognized the legitimacy of the Debtor's Vestry (which never occurred),[68] it just simply ceased to be the Vestry of the Debtor, at which point ACNA All Saints, being the recognized "All Saints' Episcopal Church" parish in union with the Fort Worth Diocese, was free to elect its own, brand new vestry of the Debtor.[69]

---

[65] *See* Movants' Exh. 11, ¶¶ 6-7 (Rev. Pigeon Declaration).

[66] *See* Debtor's Exh. 13, at p.42 (Rev. Pigeon deposition) (acknowledging that the members of ACNA All Saints never voted to remove the Debtor's Vestry); Debtor's Exh. 16, at p.85 (Brackett deposition) (acknowledging that the governing documents of the Debtor were never changed or replaced so as to somehow eliminate the Debtor's existing Vestry).

[67] *See* Debtor's Exh. 16, at p.56 (Brackett deposition) ("Q. Okay. Does [ACNA All Saints] make any claim in this lawsuit to control a corporation in Texas named All Saints' Episcopal Church? A. No, we do not.").

[68] *See* Debtor's Exh. 14, at p.232 (Bishop Iker deposition) (confirming that, as the bishop of the Fort Worth Diocese, he never attempted to disband the Debtor's Vestry); Debtor's Exh. 15, at p.64 (Bishop Reed deposition) (confirming no knowledge of any action taken by the Fort Worth Diocese to unseat the Debtor's Vestry).

[69] *See* Debtor's Exh. 13, at pp.28-29 (Rev. Pigeon deposition) (expressing the view that the Debtor's Vestry ceased being the vestry of the Debtor "[w]henever it was not recognized by the diocesan bishop", at which point ACNA All Saints needed its own separate vestry).

### *DISCUSSION*

Pursuant to the Motion, the Movants seek dismissal of this case pursuant to section 1112(b)(1) of the Bankruptcy Code. In relevant part, section 1112(b)(1) provides that, on request of a party in interest and after notice and a hearing, "the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."[70] Here, the Movants assert that "cause" for dismissal exists because the bankruptcy filing was allegedly not authorized by the Debtor's Vestry. The Debtor asserts otherwise.

### A.    *Unauthorized Filing as Cause for Dismissal*

There is no dispute about the fact that a non-profit corporation may obtain relief under chapter 11 of the Bankruptcy Code.[71] Being a legal construct, however, a corporation may only take such action if authorized by its legally appointed agents.[72] The Bankruptcy Code does not specify who constitutes the legally appointed agents of a corporation for purposes of authorizing the filing of a bankruptcy petition. Therefore, in the case of a corporation incorporated under state law, the law of the state of incorporation determines who has the authority to authorize the filing.[73]

If, as of the time of the bankruptcy filing, those purporting to have taken action on behalf of the corporation lacked authority under applicable state law to authorize the filing, then cause exists for dismissal of the case under section 1112(b)(1) of the Bankruptcy Code. As explained

---

[70] 11 U.S.C. § 1112(b)(1).

[71] *See* 11 U.S.C. § 109(d) (identifying those who are eligible for chapter 11 relief, including certain "persons"); *id*. § 101(41) ("person" defined as including a corporation).

[72] *Franchise Servs. of N. Am., Inc. v. United States Trustee (In re Franchise Servs. of N. Am., Inc.)*, 891 F.3d 198, 206 (5th Cir. 2018).

[73] *Price v. Gurney*, 324 U.S. 100, 106 (1945); *Franchise Servs. of N. Am., Inc*., 891 F.3d at 206.

by the Supreme Court, if a court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition."[74]

## B. *Authorization of Corporate Action Under Applicable Texas Law*

The Debtor is a Texas non-profit corporation. Therefore, the Court must look to Texas law for guidance on whether the Debtor's bankruptcy filing was duly authorized. In this regard, and inasmuch as it has been suggested by ACNA All Saints' representative in recent deposition testimony that the governance of the Debtor is in some way dictated by the ecclesiastical views of the bishop of the Fort Worth Diocese,[75] it is first important to emphasize the Texas Supreme Court's stance that neutral, secular principles of Texas law are to be applied to the judicial resolution of issues involving the governance of Texas corporations.[76]

Looking to such neutral principles, sections 22.201 and 22.202(b) of the Texas Business Organizations Code (the "**TBOC**") provide that the affairs of a non-profit religious corporation are to be managed by a board of directors (sometimes also referred to as the "vestry" by religious corporations)[77] in the absence of the vesting of such managerial rights in the corporation's

---

[74] *Price*, 324 U.S. at 106; *Franchise Servs. of N. Am., Inc.*, 891 F.3d at 206-07.

[75] *See* Debtor's Exh. 13, at p.29 (Rev. Pigeon deposition) (expressing the view that the Debtor's Vestry ceased being the vestry of the Debtor "[w]henever it was not recognized by the diocesan bishop").

[76] *See Masterson v. Diocese of N.W. Tex.*, 422 S.W.3d 594, 606 (Tex. 2013) ("Properly exercising jurisdiction requires courts to apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues. Thus, courts are to apply neutral principles of law to issues such as … corporate … governance …, even when religious entities are involved"), *cert. denied*, 574 U.S. 973 (2014); *see also Jones v. Wolf*, 443 U.S. 595, 602-03 (1979) (explaining that because "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice", a court should strive to apply neutral, secular principles of law in resolving such disputes so as to avoid any entanglement in questions of religious doctrine, policy and practice).

[77] For purposes of provisions of the TBOC, a "director" means "a person who is a member of the board of directors, regardless of the name or title used to designate the person" and a "board of directors" means "the group of persons vested with the management of the affairs of the corporation, regardless of the name used to designate the group." *See* Tex. Bus. Org. Code §§ 22.001(1) and 22.001(3-a).

members (which is not the case here).[78]  Pursuant to section 22.206 of the TBOC, directors (other than the initial directors) are elected, appointed, or designated in the manner provided by the certificate of formation or bylaws.[79]  In the Debtor's case, the Bylaws during the relevant time frame provided for members of the Vestry (who had to be confirmed communicants of Episcopalian All Saints in good standing with the church at the time of election)[80] to be elected at the annual parish meetings of Episcopalian All Saints by a majority vote of those present at the meeting qualified to vote – being communicants of Episcopalian All Saints of at least 16 years of age and in good standing with the church, as listed on the church's communicant rolls.[81]  For purposes of taking a vote, ten percent (10%) of the qualified voters in the parish constituted a quorum.[82]  If a vacancy in the membership of the Vestry occurred between annual parish meetings, then the remaining members of the Vestry were authorized to elect a new member to fill the vacant spot through the end of the unexpired term.[83]

With respect to the removal of Vestry members, "[u]nless a director of a non-profit corporation resigns or is removed, he or she holds office for the period specified in the certificate of formation or bylaws and until a successor is elected, appointed, or designated and qualified."[84]  To remove a duly-elected director of a non-profit corporation, section 22.211 of the TBOC

---

[78] *See id.* §§ 22.201 and 22.202(b) (providing for the affairs of a non-profit corporation incorporated prior to 1994 to be managed by a board of directors in the absence of a provision in the certificate of formation providing for management to be vested in the members, or in the case of a church organized as a corporation, an established congregational system that has the corporation's management vested in the members, neither of which is applicable).

[79] *See id.* § 22.206.

[80] *See* 2001 Bylaws (art. VI, § A).

[81] *See id.* (art. VI, §§ A-B).

[82] *See id.*

[83] *See id.* (art. III, § A).

[84] *Episcopal Church v. Salazar*, 547 S.W.3d 353, 415 (Tex. App. – Fort Worth 2018) (citing Tex. Bus. Org. Code § 22.208), *aff'd in part, rev'd in part*, 602 S.W.3d 417 (Tex. 2020).

provides that the removal must occur in accordance with the removal procedures provided by the corporation's certificate of formation or bylaws, or if there are no such procedures, then by an affirmative vote equal to the vote necessary to elect the director.[85] In the Debtor's case, the Bylaws during the relevant time frame did not provide for any removal procedures. Therefore, pursuant to section 22.211 of the TBOC, removal required the same vote as applicable to the member's election to the Vestry.

Turning to authorized actions of the Vestry, section 22.214 of the TBOC provides that the act of a majority of the directors present (in person or by proxy) at a meeting at which a quorum is present constitutes the act of the board of directors (unless a greater number is required by the certificate of formation or bylaws of the corporation).[86] Section 22.213 of the TBOC provides, in relevant part, that a quorum for the transaction of business by the board is the lesser of the majority of the number of directors set by the corporation's bylaws or any number (not less than three) set as the quorum by the certificate of formation or bylaws.[87] Finally, section 22.220 of the TBOC provides that any action may be taken by the board without a meeting upon the written consent of at least the number of directors that would need to vote to approve the action at a meeting attended by all directors.[88] The Debtor's Bylaws, at all relevant times, were consistent with the foregoing provisions of the TBOC. They provided for a majority of the Vestry to constitute a quorum for purposes of conducting business, contemplated the Vestry's approval of any action by a majority

---

[85] *See* Tex. Bus. Org. Code § 22.211.

[86] *See id.* § 22.214.

[87] *See id*. § 22.213(a).

[88] *See id*. § 22.220(a).

vote of those present (whether in person or by proxy),[89] and permitted the Vestry's approval of any action by unanimous written consent in lieu of a meeting.[90]

### C. *Movants' Argument With Respect to Lack of Authorization*

Movants' principal assertion in support of the argument that the bankruptcy filing was unauthorized is that when the State Court allegedly "found [ACNA All Saints] [to be] the continuing All Saints' Episcopal Church" in the State Court Judgment, it thereby also effectively determined that ACNA All Saints is "the only one that would have legal authority to institute these proceedings." Reply, ¶ 2. Thus, according to the Movants, these alleged determinations by the State Court are binding in these proceedings under principles of res judicata and collateral estoppel. The Debtor disputes such contention on at least two grounds. First, the Debtor emphasizes that it was never a party to the state court litigation. Second, the Debtor argues that neither res judicata nor collateral estoppel applies because issues involving control of the Debtor were never part of the litigation and were never actually litigated. For reasons that follow, the Court agrees with the Debtor.

Under Texas law, "[f]or res judicata to apply, the following elements must be present: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) the same parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action."[91] For collateral estoppel or issue preclusion to apply under Texas law, the "party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action;

---

[89] *See* 2001 Bylaws (art. III, § B) (providing for a majority of the Vestry to constitute a quorum and for each member of the Vestry to have a vote, with the Rector having the right to cast the deciding vote in the event of a tie).

[90] *See id.* (art. III, § C).

[91] *Igal v. Brightstar Info. Tech. Group, Inc.*, 250 S.W.3d 78, 86 (2002); *see also BVS Constr., Inc. v. Prosperity Bank (In re BVS Constr., Inc.)*, 18 F.4th 169, 173 (5th Cir. 2021).

(2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action."[92]  Under both tests, putting aside the fact the Debtor, itself, was never a party to the state court litigation, which is a significant problem for the Movants, the Movants' res judicata and collateral estoppel arguments fail for the very simple reason that (a) neither the composition of the Debtor's Vestry nor control of the Debtor was ever a claim or issue presented for determination to the State Court, (b) neither of these matters was actually litigated in the state court action, and (c) neither of these matters was essential to resolution of the claims and issues *actually* presented for determination in the action.  Indeed, a simple review of the State Court Judgment, itself, bears this out, inasmuch as no reference at all is made to either the Debtor or the Debtor's Vestry therein.[93]

Instead, it was the composition of the leadership and the control of the *Fort Worth Diocese* and the *Diocesan Corporation* and the ownership of Diocesan Trust Property held in trust by the *Diocesan Corporation* that was at issue in the litigation.[94]  And while it is true that, in resolving disputed claims of beneficial ownership to certain of the Diocesan Trust Property, the State Court determined that ACNA All Saints constituted the "All Saints' Episcopal Church" parish *in union with the Fort Worth Diocese* for purposes of the trust provisions of the *Diocesan Corporation's* organizational documents, such determination has absolutely nothing to do with the following, among other, material issues associated with the composition of the Debtor's Vestry and control of the Debtor: (1) the validity/invalidity of any election of individuals to the Debtor's Vestry; (2) the removal of any validly-elected members of the Debtor's Vestry; (3) the identification of the

---

[92] *John G. & Marie Stella Kennedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002) (quoting *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994)); *see also Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 934 (5th Cir.), *cert. denied*, 527 U.S. 1004 (1999).

[93] *See* Movants' Exh. 2 (State Court Judgment).

[94] *See id*.

validly-elected members of the Debtor's Vestry; and (4) the members of the Debtor entitled to vote to elect members of the Debtor's Vestry. As such, the State Court Judgment (and Judgment Enforcement Order) has no res judicata or collateral estoppel effect on the question of whether the Debtor's bankruptcy filing was legally authorized.

### D.      Authorization of the Bankruptcy Filing

This then leads back to the question of whether the filing was properly authorized under Texas law. The Court finds that it was. In this regard, the Debtor was organized by Episcopalian All Saints in 1953 to facilitate its operations. As such, pursuant to the Debtor's Bylaws, the voting members of the Debtor were and always have been communicants of Episcopalian All Saints of at least 16 years of age who are in good standing with the church. When the schism between the Episcopal Church and the breakaway leadership of the Fort Worth Diocese occurred in 2008, only 184 of the roughly 2,000 Episcopalian All Saints parishioners decided to leave the church,[95] and only five of the Debtor's fifteen-member Vestry resigned.[96]

Certain of these ex-members elected to reorganize as an entirely new religious association affiliated with the breakaway Fort Worth Diocese – ACNA All Saints. While these ex-members of Episcopalian All Saints were certainly free to take such action, in so doing they also relinquished their right to have any continuing involvement in the affairs of Episcopalian All Saints and the Debtor. Indeed, it is undisputed that no action, or attempted or purported action, was ever taken by the members of ACNA All Saints or the Fort Worth Diocese to remove any of the members of

---

[95] *See* Debtor's Exh. 1, ¶ 16 (Rev. Jambor Declaration).

[96] *See* Debtor's Exh. 15, at p.18-19 (Bishop Reed deposition).

the Debtor's Vestry.[97]  And at least through 2015, ACNA All Saints had made no claim to any control of the Debtor.[98]

Simply put, following the departure of the small number of Episcopalian All Saints parishioners and the resignation of the small number of Debtor Vestry members, Episcopalian All Saints and the Debtor went about their normal business without the involvement of those who voluntarily elected to depart.  And through the date of the Debtor's bankruptcy filing, members of the Debtor's Vestry were elected at annual Episcopalian All Saints parish meetings (or, in one case, by the remaining members of the Vestry upon the resignation of a member who moved out of state) in accordance with the Bylaws.[99]  On October 19, 2021, the existing members of the Debtor's Vestry voted to authorize the Debtor's filing of a petition for relief under chapter 11 of the Bankruptcy Code.[100]  In accordance with such approval, the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on October 20, 2021, thereby initiating this case.

## CONCLUSION

Based upon the foregoing, the Court finds that the Debtor's filing of this bankruptcy case was authorized by the duly and lawfully elected members of the Debtor's Vestry.  Inasmuch as the validity of the filing was the sole basis for dismissal advanced by the Movants, the Court finds that the Movants have failed to establish cause for dismissal of this case under section 1112(b)(1) of

---

[97] *See* Debtor's Exh. 13, at p.42 (Rev. Pigeon deposition) (acknowledging that the members of ACNA All Saints never voted to remove the Debtor's Vestry); Debtor's Exh. 16, at p.85 (Brackett deposition) (acknowledging that the governing documents of the Debtor were never changed or replaced so as to somehow eliminate the Debtor's existing Vestry); Debtor's Exh. 14, at p.232 (Bishop Iker deposition) (confirming that, as the bishop of the Fort Worth Diocese, he never attempted to disband the Debtor's Vestry); Debtor's Exh. 15, at p.64 (Bishop Reed deposition) (confirming no knowledge of any action taken by the Fort Worth Diocese to unseat the Debtor's Vestry).

[98] *See* Debtor's Exh. 16, at p.56 (Brackett deposition) ("Q. Okay. Does [ACNA All Saints] make any claim in this lawsuit to control a corporation in Texas named All Saints' Episcopal Church?  A. No, we do not.").

[99] *See* Debtor's Exh. 1, ¶ 17 (Rev. Jambor Declaration); Debtor's Exh. 8 (history of Vestry membership from 2009 to present).

[100] *See* Debtor's Exh. 1, ¶ 24 (Rev. Jambor Declaration); Debtor's Exh. 11 (executed resolution of the Debtor's Vestry documenting such authorization).+

Page 28

the Bankruptcy Code.  Thus, it is for these reasons that the Court entered the Dismissal Denial

Order denying the Motion.

### ###   END OF MEMORANDUM OPINION   ###