Patrick J. Neligan, Jr.
State Bar. No. 14866000
Douglas J. Buncher
State Bar No. 03342700
John D. Gaither
State Bar No. 24055516
NELIGAN LLP
4851 LBJ Freeway, Suite 700
Dallas, Texas 75244
Telephone: 214-840-5300
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

COUNSEL FOR DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **ALL SAINTS EPISCOPAL CHURCH** | § | **CASE NO. 21-42461-11-ELM** |
| | § | |
| **DEBTOR** | § | |

---

## DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION
## OF ALL SAINTS EPISCOPAL CHURCH UNDER
## <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

Dated: January 31, 2024

| **Important Information for You to Read** |
| --- |

The Debtor is providing the information in this Disclosure Statement to Holders of Claims for the purpose of soliciting votes to accept or reject the Plan, which is attached hereto as <u>Exhibit A</u>.  Capitalized terms not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.  Nothing in this Disclosure Statement may be relied upon or used by any entity for any purpose other than solicitation of votes on the Plan.  The Debtor has not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.   Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

Before deciding whether to vote for or against the Plan, every Holder of a Claim entitled to vote on the Plan should:  (a) read the entire Disclosure Statement and the Plan carefully;  (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article VII of this Disclosure Statement; and (c) consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, all documents attached hereto, and the proposed transaction contemplated thereby.  If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims (including those Holders of Claims who do not submit Ballots to accept or reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan.

The Debtor believes that the Plan is fair and equitable, provides for a larger distribution to Creditors than would otherwise result from liquidation under chapter 7 of the Bankruptcy Code, and maximizes the value of the Debtor's Estate and the return to Creditors. The Debtor strongly supports confirmation of the Plan and urges all Holders of Claims whose votes are being solicited to accept the Plan.

<u>The Voting Deadline for the Plan is [_____] at 5:00 P.M., (Central Time)</u>

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT BEFORE THE APPLICABLE VOTING DEADLINE.

\* \* \* \* \*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................................1

I. OVERVIEW OF PLAN AND TREATMENT OF CLAIMS ....................................................2

    A.    Overview of the Plan ...................................................................................2

    B.    Treatment of Claims ...................................................................................2

II. SOLICITATION, VOTING, AND CONFIRMATION DEADLINES ........................3

    A.    Solicitation Packages ..................................................................................3

    B.    Voting Deadline ..........................................................................................4

    C.    Voting Procedures.......................................................................................4

    D.    Plan Objection Deadline .............................................................................4

    E.    Confirmation Hearing .................................................................................4

III. BACKGROUND AND DISCLOSURES.................................................................5

    A.    Overview of the Debtor and its Operations ................................................5

    B.    The Debtor's Assets ...................................................................................5

    C.    The Debtor's Pre- and Postpetition Liabilities...........................................7

    D.    Events Leading to the Debtor's Chapter 11 Filing .....................................7

IV. THE DEBTOR'S CHAPTER 11 CASE ................................................................10

    A.    First Day Motions .....................................................................................10

    B.    Claims Process and Bar Date ...................................................................11

    C.    Cash Management Motion..........................................................................11

    D.    Motion to Dismiss .....................................................................................12

    E.    Motion for Leave to Appeal and Subsequent Motions to Dismiss ............12

    F.    Adversary Proceeding ...............................................................................12

    G.    ACNA All Saints Claim.............................................................................13

    H.    Global Settlement......................................................................................13

V. SUMMARY OF THE PLAN......................................................................................14

    A.     Overview................................................................................................14

    B.     Classification and Treatment of Claims....................................................15

    C.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ...................................................................................................17

    D.     Means for Implementation of the Plan......................................................17

    E.     Settlement, Release, Injunction, and Related Provisions...........................17

    F.     Treatment of Executory Contracts and Unexpired Leases ........................20

    G.     Conditions Precedent to Confirmation and Consummation of the Plan .....................................................................................................20

VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN...........20

    A.     Confirmation Hearing .............................................................................20

    B.     Procedure for Objections ........................................................................20

    C.     Requirements for Confirmation ...............................................................21

    D.     Exculpation and Injunctions Provisions....................................................22

    E.     Classification of Claims and Equity Interests ...........................................23

    F.     Impaired Claims.....................................................................................23

    G.     Disclosure of Officers and Directors of the Reorganized Debtor...............23

    H.     Best Interests of Creditors Test—Liquidation Analysis ............................23

    I.     Feasibility..............................................................................................25

    J.     Eligibility to Vote on the Plan .................................................................25

    K.     Solicitation and Confirmation Notice .......................................................25

VII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING .............25

    A.     Bankruptcy Law Considerations...............................................................26

    B.     Risks Related to the Debtor's and Reorganized Debtor's Operations .........................................................................................28

C.       Risks Associated with Forward Looking Statements ................................31

D.       Plan Disclaimer ........................................................................................31

VIII. [RESERVED] .........................................................................................................33

IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
      PLAN ................................................................................................................33

X. RECOMMENDATION OF THE DEBTOR ................................................................33

**<u>EXHIBITS</u>**

EXHIBIT A    Chapter 11 Plan of Reorganization

## PRELIMINARY STATEMENT

The Debtor has continuously operated as All Saints Episcopal Church in Fort Worth, Texas, a parish within The Episcopal Church in the United States of America, since the early 1950s.  The Debtor's operations are devoted to religious and charitable activities conducted in union and accordance with the Constitution and Canons of the General Convention of The Episcopal Church.  The Debtor and its affiliated parish were formerly associated with EDFW, a regional diocese within The Episcopal Church.  However, in 2008, EDFW and certain members of the Debtor's congregation renounced their affiliation with The Episcopal Church, terminated their association with the Debtor, and established their own religious province in union with the Anglican Church in North America   After leaving The Episcopal Church and the Debtor's congregation, ACNA All Saints and the Diocesan Corporation asserted claims to ownership of certain church property, including charitable assets donated to the Debtor and The Episcopal Church, with which ACNA All Saints and the Diocesan Corporation have no affiliation.  The resulting dispute led to litigation lasting more than fourteen years.  ACNA All Saints' pre-bankruptcy attempts to seize the Debtor's charitable assets ultimately became an existential threat to the Debtor and could have resulted in the misappropriation and dissipation of charitable trust funds in violation of donors' wishes and intent.  The Debtor filed this bankruptcy to protect its charitable assets while pursuing a complete and final adjudication of the parties' property disputes.

In late 2023, the Debtor, ACNA All Saints, and the Diocesan Corporation reached an agreement settle and resolve all claims and disputes arising from or related in any way to the separation of EDFW and ACNA All Saints from The Episcopal Church and from the Debtor's congregation (the "Global Settlement").  The Global Settlement, which is described more fully below, has been approved by the Bankruptcy Court and fully consummated as of early 2024.  Consummation of the Global Settlement paves the way for the Debtor to pay all remaining Claims in full and to emerge from bankruptcy as a reorganized charitable organization.  If confirmed, the Plan will discharge all Claims against the Debtor and revest church property in the Reorganized Debtor free and clear of all such Claims.  Confirmation of the Plan will therefore ensure the Debtor's ability to continue its religious and charitable mission for years to come, all while protecting and preserving the Debtor's charitable assets and its donors' wishes.

The Debtor intends to seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable holders of claims and interests to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. The Debtor believes this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtor and its leadership have approved the Plan and believe that the Plan is in the best interests of the Debtor, its Estate, Holders of Claims, and the Debtor's membership.  The Debtor recommends that all Holders of Claims entitled to vote on the Plan vote to accept the Plan by returning their ballots, so as to be actually received by the Debtor's Balloting Agent no later than [___], **at 5:00 p.m. (Central Time)**. The Debtor intends to seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

# I. OVERVIEW OF PLAN AND TREATMENT OF CLAIMS

## A. Overview of the Plan

The Debtor's bankruptcy filing was precipitated by its years-long dispute with ACNA All Saints and the Diocesan Corporation over ownership of church property and assets. As of the Petition Date, the Debtor's assets generally consisted of cash, donor-restricted endowment funds, and certain real properties. Pursuant to the Global Settlement, the Debtor transferred certain assets, including the Permanent Endowment and the real properties located at 5001 Dexter Avenue and 5005 Dexter Avenue, Fort Worth, Texas 76107 to ACNA All Saints and the Diocesan Corporation. All of the Debtor's remaining assets will be retained and revested in the Reorganized Debtor under the Plan. The Plan generally provides for the payment of all Allowed Claims in full, including the reinstatement of the NBT Secured Claim, which shall be repaid by the Reorganized Debtor in accordance with the NBT Loan Documents, and the payment of Allowed General Unsecured Claims within twenty-four (24) months of the Effective Date.

The Plan provides for the fair and equitable treatment of all Creditors and will result in a greater distribution to Holders of Allowed Claims than would be possible under a hypothetical liquidation under chapter 7 of the Bankruptcy Code and encourages all Holders of Clams entitled to vote to accept the Plan.

## B. Treatment of Claims

As set forth in Article IV of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan. The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only. Risk factors addressing the effects of the actual amount of Allowed Claims exceeding the Debtor's estimates, and the effect of such variation on Creditor recoveries, and other risks related to Confirmation and the Effective Date of the Plan are addressed in Article VII hereof. To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

The table below summarizes the treatment of all unclassified Claims against the Debtor under the Plan:

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| Administrative Expense Claims[1] | Unimpaired | $0 | n/a | n/a |
| Professional Fee Claims[2] | Unimpaired | $1,000,000 | 100% | 100% |
| Priority Tax Claims | Unimpaired | $0 | n/a | n/a |

The table below summarizes the classification and treatment of all classified Claims against the Debtor under the Plan.

| Class | Claim | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 1 | NBT Secured Claim | Unimpaired | $100,000 | 100% | 100% |
| 2 | Miscellaneous Secured Claims | Unimpaired | $0 | n/a | n/a |
| 3 | Other Priority Claims | Unimpaired | $0 | n/a | n/a |
| 4 | General Unsecured Claims | Impaired | $330,000 | 100% | 35% |
| 5 | ACNA All Saints Claim | Disallowed | n/a | n/a | n/a |

## II.  SOLICITATION, VOTING, AND CONFIRMATION DEADLINES

### A.  Solicitation Packages

Holders of Claims against the Debtor will receive appropriate solicitation materials, including (i) a Ballot or Notice of Non-Voting Status, (ii) a notice of the Bankruptcy Court's approval of the Disclosure Statement, approval of voting procedures for voting on the Plan, scheduling of the Confirmation Hearing and the deadlines for objecting to confirmation, (iii) and copies of the Disclosure Statement and Plan (collectively the "Solicitation Package").  The Solicitation Package may also be obtained by sending a written or emailed request to the Debtor,

---

[1] The Debtor currently believes that the only unpaid Allowed Administrative Expense Claims payable under the Plan will be Professional Fee Claims.

[2] The represents the Debtor's present estimate of Allowed Professional Fee Claims and is subject to change.

c/o Neligan LLP, Attn: Carolyn Perkins, 4851 LBJ Freeway, Suite 700, Dallas, Texas 75244,
ballotingagent@neliganlaw.com.

**B.    Voting Deadline**

The Voting Deadline is **[_____], 2024 at 5:00 p.m. (Central Time)**. All votes to accept
or reject the Plan must be received by the Balloting Agent by the Voting Deadline.

**C.    Voting Procedures**

The Debtor is distributing this Disclosure Statement, accompanied by a Ballot to be used
for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject
the Plan.  If you are a Holder of a Claim in Class 4 you may vote to accept or reject the Plan by
completing the Ballot and returning it to the Balloting Agent.

Holders of Claims should follow the instructions in the Solicitation Package regarding the
submission of votes to accept or reject the Plan.  More detailed instructions regarding how to vote
on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote
to accept or reject the Plan.  All votes to accept or reject the Plan must be cast by using the
appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to
their applicable voting instructions so that the Ballots are **actually received** by the Balloting Agent
no later than the Voting Deadline at the return address set forth in the applicable Ballot.  Each
Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each
Claim held by such Holder.  By signing and returning a Ballot, each Holder of a Claim entitled to
vote will certify to the Bankruptcy Court and the Debtor that no other Ballots with respect to such
Claim has been cast or, if any other Ballots have been cast with respect to such Claim, such earlier
ballots are superseded and revoked.

**D.    Plan Objection Deadline**

The Bankruptcy Court has established **[_____], 2024 at 5:00 p.m. (Central Time)**, as the
deadline to object to Confirmation of the Plan (the "Plan Objection Deadline").  All such objections
must be Filed with the Bankruptcy Court so that they are actually received on or before the Plan
Objection Deadline.

**E.    Confirmation Hearing**

Assuming the requisite acceptances are obtained for the Plan, the Debtor intends to seek
confirmation of the Plan at the Confirmation Hearing scheduled on **[_____], 2024 at [_____]
(Central Time)**, before the Honorable Edward L. Morris, United States Bankruptcy Judge, at the
Eldon B. Mahon Courthouse, 501 W. Tenth Street, Room 204, Fort Worth, Texas 76102. The
Confirmation Hearing may be continued from time to time, without further notice other than an
adjournment announced in open court, or a notice of adjournment Filed with the Bankruptcy Court
and served on any entities who have filed objections to the Plan.  The Bankruptcy Court, in its
discretion and before the Confirmation Hearing, may put in place additional procedures governing
such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the
Confirmation Hearing, without further notice to parties in interest, subject to the terms of the
Bankruptcy Code.

## III.  <u>BACKGROUND AND DISCLOSURES</u>

### A.    <u>Overview of the Debtor and its Operations</u>

All Saints Episcopal Church in Fort Worth, Texas has existed since the late 1940s.  In early 1953, the members of All Saints Episcopal Church determined to organize a nonprofit corporation to facilitate the church's operations.  The stated purpose for which the Debtor was formed is to facilitate the association of the Debtor's members for the purpose of maintaining the worship of God and the preaching of the Gospel according to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America ("<u>The Episcopal Church</u>").  The Debtor was incorporated as a Texas non-profit corporation by filing of Articles of Incorporation with the Texas Secretary of State in 1953.  Since that time, the operations of All Saints Episcopal Church in Fort Worth, Texas have been conducted through the Debtor corporation.

The Debtor's affairs are governed by its corporate bylaws.  The Debtor has no capital stock.  The Debtor has members, which consist of the communicants in good standing.  Under the Debtor's bylaws, the Debtor is managed by a 15-member board of directors referred to as the "Vestry."  The members of the Vestry are elected by the Debtor's members entitled to vote at annual parish meetings.  The Debtor's congregation is led by the Debtor's Rector, which is appointed by the Vestry.  From the early 2000's through December 31, 2023, Reverend Christopher Jambor was the Debtor's Rector and the leader of the Debtor's congregation.  Reverend Jambor retired as of December 31, 2023, and, as of the date of this Disclosure Statement, the Debtor is led by its Vestry and Senior Ward, Stephanie Burk, who serves as the Debtor's President under the bylaws.  The Debtor's congregation is currently led by Mthr. Madeline Hill as Priest-in-Charge.

In addition to conducting routine religious services, the Debtor sponsors many charitable and community outreach programs, including sponsoring orphanages, participating in programs for feeding and housing those experiencing homelessness, supporting women's shelters, and more.  The Debtor primarily funds its operations through member donations and pledges.  The Debtor has approximately 1,500 members, and its gross revenue is approximately $1,500,000 to $2,000,000 per year.

### B.    <u>The Debtor's Assets</u>

Other than personal property used in the course of the Debtor's religious operations, the Debtor owned three primary categories of assets as of the Petition Date:  (1) Cash and financial accounts, (2) endowment funds held pursuant to the New Endowment and Permanent Endowment, and (3) the real properties located at 4936 Dexter Avenue, 4939 Dexter Avenue, 5001 Dexter Avenue, and 5005 Dexter Avenue, Fort Worth, Texas 76107.  As of the Petition Date, the Debtor held approximately $543,000 in Cash and financial accounts, most of which are held at Frost Bank. The Debtor also had a secured line of credit at National Bank of Texas at Fort Worth in the amount of $120,000.

The Debtor maintained two separate Endowment Funds: the Permanent Endowment, which had a value of approximate $652,000 as of the Petition Date, and the New Endowment, which had a value of approximately $679,000, as of the Petition Date.  The Permanent Endowment

is subject to a restrictive trust agreement that provides for the distribution of a limited amount of the endowment's earning to the Debtor each year.  As discussed below, the Permanent Endowment has been transferred to ACNA All Saints and the Diocesan Corporation pursuant to the Global Settlement.  The New Endowment is a general-purpose endowment fund that aggregates charitable contributions to the Debtor.  Although the funds are held collectively, the Debtor maintains detailed records relating to the purpose of the various donations and the intent of the original donors. As a result, while the fund is aggregated, subsets of the fund are restricted to use for specific activities (i.e., church music program, education, community outreach).  The Debtor's endowment funds are overseen by a six-person Endowment Board, which meets quarterly, as well as the finance committee of the Debtor's Vestry. The Endowment Board manages the Debtor's endowment funds in accordance with the fund agreements, which include investment objectives and policies governing the investments that may be made by the fund.  The Endowment Board also ensures that the Debtor's charitable funds are used for purposes consistent with the donative intent behind such funds and with applicable law.

As of the Petition Date, the Debtor also owned four parcels of real properties.  The real properties owned by the Debtor as of the Petition Date are located at (i) 4936 Dexter Avenue, Fort Worth, Texas 76107, (ii) 4939 Dexter Avenue, Fort Worth, Texas 76107 (iii) 5001 Dexter Avenue, Fort Worth, Texas 76107 and (iv) 5005 Dexter Avenue, Fort Worth, Texas 76107.  Pursuant to the Global Settlement, the Debtor transferred the properties at 5001 Dexter Avenue and 5005 Dexter Avenue, Fort Worth, Texas 76107 to ACNA All Saints and the Diocesan Corporation.  After consummation of the Global Settlement, the Debtor continues to own and occupy the real properties located at 4936 Dexter Avenue and 4939 Dexter Avenue, Fort Worth, Texas 76107. Based on appraisals received during the Bankruptcy Case, the Debtor believes that these two properties are collectively worth approximately $1,490,000.

As set forth above, a large portion of the Debtor's current assets are subject to legally enforceable restrictions requiring the use or disposition of such asset for a particular purpose.  Such assets are legally protected under applicable laws governing charities and other non-profit organizations and, therefore, are not available to satisfy certain creditors' Claims.  Such assets may not be distributed to creditors because (i) they are subject to donors' restrictions on use and purpose; (ii) they are core to the Debtor's charitable mission and programs; (iii) they are held in an express or implied charitable trust; (iv) selling or liquidating the assets would violate applicable non-bankruptcy law governing the transfers of assets by nonprofit corporations; or (vi) selling or liquidating the restricted assets would contradict the Bankruptcy Code's treatment of charitable organizations.  Specifically, certain of the Debtor's assets were donated with a restriction as to use or purpose rather than for general charitable purposes and therefore, pursuant to section 541 of the Bankruptcy Code, may not be property of the Debtor's Estate. Moreover, to the extent that a donor made a restricted donation, the Debtor is legally obligated to effectuate the donor's intent.  Further, both unrestricted and restricted donations made to a charity are subject to a charitable trust and cannot be diverted and used in contravention of the nonprofit's charitable mission. The same is true under the Texas Not-For-Profit Corporation Law, which states that property donated for a nonprofit's charitable mission cannot be diverted away from its original purpose by sales, leases, repayment of debt, or other transfers of the property.  The sale or use of donor-restricted assets without the Debtor's or donors' consent would also conflict with the Bankruptcy Code's treatment of non-profit corporations and bankruptcy case law holding that a charity may retain assets

-6-

notwithstanding the lack of full payment of its creditors because the absolute priority rule does not apply in a restructuring of a charitable organization without equity interests.

As of the Petition Date, the Debtor's Unrestricted Assets consisted of the two remaining Real Properties, Cash in the amount of $119,839, and funds in the New Endowment in the amount of $27,215. The Debtor believes the Unrestricted Assets had a total approximate value of $1,637,054 as of the Petition Date. The remainder of the Debtor's assets are Restricted Assets. Only Unrestricted Assets are available for satisfaction of Claims under the Plan. All Restricted Assets will be retained by the Debtor.

## C.      The Debtor's Pre- and Postpetition Liabilities

As of the Petition Date, the Debtor's alleged liabilities generally consisted of (1) the NBT Secured Claim in the approximate amount of $100,000, which is secured by a lien on the Real Property located at 4939 Dexter Avenue, Fort Worth, Texas, 76107 (2) General Unsecured Claims in the approximate amount of $330,000, some of which have been satisfied under prior orders of the Bankruptcy Court, and (3) the ACNA All Saints Claim, which was a contingent, disputed, and unliquidated Claim asserted in the amount of approximately $5.3 million. Pursuant to the Global Settlement, the ACNA All Saints Claim has been disallowed in its entirety, and there will be no distribution on account of the ACNA All Saints Claim under the Plan. Accordingly, the Debtor's remaining prepetition liabilities to be treated under the Plan are limited (i) the NBT Secured Claim and (ii) General Unsecured Claims.

The Debtor will also be subject to Professional Fee Claims that must be paid under the Plan. The Debtor believes such claims will be limited to the Professional Fee Claim of Neligan LLP, which currently holds a Professional Fee Claim exceeding $1,000,000, subject to approval and allowance by the Bankruptcy Court. Neligan LLP has informally agreed to accept a payment of $850,000 in full satisfaction of its Professional Fee Claim, with such amount to be paid in accordance with the order approving and allowing Neligan LLP's Professional Fee Claim. Such allowance and agreement remain subject to approval by the Bankruptcy Court.

## D.      Events Leading to the Debtor's Chapter 11 Filing[3]

### 1.      Schism Among the EDFW and Departure of a Small Group of the Debtor's Members

The Episcopal Church is a three-tiered organization, the highest tier comprised of the General Convention, which consists of representatives of each regional diocese and most bishops, a second tier comprised of geographically defined regional diocese, and a third tier comprised of local parishes, missions and congregations. In 2008, EDFW elected to remove and dissociate itself from The Episcopal Church. The decision to split from The Episcopal Church centered around doctrinal differences between the leadership of EDFW and The Episcopal Church. After EDFW voted to leave The Episcopal Church, the Debtor's Vestry and leadership determined to remain

---

[3] The events leading to the Debtor's Chapter 11 Case, including a detailed history of the relationship and disputes among the Debtor, ACNA All Saints, the Diocesan Corporation and EDFW, were thoroughly recounted by the Bankruptcy Court in its Memorandum Opinion issued in the Chapter 11 Case on December 29, 2021. *See* Docket No. 128.

associated with The Episcopal Church.  As a result of this decision, a small fraction (less than 10%) of the Debtor's approximately 2,000 members choose to leave the Debtor's congregation and terminate their association with the Debtor in late 2008 and early 2009.  This faction associated with the now-departed EDFW within a new province called the Anglican Church in North America.[4]

As a result, with respect to the Debtor, there were two groups of members, a large group of members that remained associated with the Debtor as part of The Episcopal Church ("Episcopalian All Saints"), and a small group of former members that chose to leave and form their own congregation, in association with EDFW, referred to in the Plan as "ACNA All Saints." Although ACNA All Saints and EDFW renounced any affiliation with The Episcopal Church and the Debtor, ACNA All Saints conducted operations as an unincorporated association under the name "All Saints Episcopal Church."

## 2. Litigation Between the Episcopal Church, the Debtor, the Diocesan Corporation, EDFW, and ACNA All Saints

Following EDFW's departure, The Episcopal Church sued EDFW and the Diocesan Corporation in the in the 141st District Court of Tarrant County, Texas (the "State Court"), Cause No. 141-252083-11 (the "First State Court Lawsuit") seeking a determination regarding ownership of certain assets.  The local parishes whose properties were affected by EDFW's departure later joined the lawsuit.  Episcopalian All Saints (but not the Debtor) joined the lawsuit in November 2012.  The Debtor was never a party to the First State Court Lawsuit.  With regard to the Debtor, the dispute in the First State Court Lawsuit centered on the ownership of two properties held in trust by the Diocesan Corporation for the benefit of the Debtor's parish, the church sanctuary and parish hall located at 5001 Crestline Drive, and the church rectory located at 5003 Dexter Avenue in Fort Worth, Texas (the "Sanctuary and Rectory Properties").  The issue to be decided in the First State Court Lawsuit was whether the Sanctuary and Rectory Properties – held in trust by the Diocesan Corporation – belonged to EDFW, the Diocesan Corporation, and ACNA All Saints or to the parishes that remained associated with The Episcopal Church, including Episcopal All Saints.  None of the Debtor's properties or assets were at issue in the First State Court Lawsuit. To the contrary, ACNA All Saints and the Diocesan Corporation expressly disclaimed and waived any claim to the Debtor's assets, including the Real Properties, in the First State Court Lawsuit.

In July 2015, the State Court entered a judgment (the "State Court Judgment") ruling that the Diocesan Corporation held the Sanctuary and Rectory Properties in trust for ACNA All Saints. Following appeals of the State Court Judgment, Episcopalian All Saints relinquished control over the Sanctuary and Rectory Properties and delivered possession of those properties to ACNA All Saints.  The Debtor was not a party to the State Court Judgment, and the State Court Judgment did not include a monetary award or affect ownership of any personal property related to the Debtor's parish.

---

[4] This province is not a member of the Anglican World-Wide Communion.

3.      **Enforcement Actions in the First State Court; Second State Court Lawsuit;
Attacks on the Debtor**

Once the State Court Judgment had become final and no longer appealable, a dispute arose
between the parties thereto with respect to whether the State Court Judgment required the turnover
of any personal property other than the property specifically described therein.  Successfully
convincing the State Court that it did, the ACNA All Saints and Diocesan Corporation obtained
entry of an order (the "Judgment Enforcement Order") requiring Episcopalian All Saints (but not
the Debtor) "to immediately deliver, as required by the [State Court Judgment], possession of all
real and personal property, in existence at the time the [litigation] was filed on April 14, 2009,
including all personal property necessary for the operations of the properties listed in the [State
Court Judgment] … as well as all financial assets that supported or enabled the operations…."

After entry of the Judgment Enforcement Order, ACNA All Saints and Diocesan
Corporation sought to seize all property within the possession of the Debtor and Episcopalian All
Saints, even though the Debtor was never a party to the First State Court Lawsuit, and even though
ACNA All Saints and the Diocesan Corporation waived any claims to the Debtor's property in the
First State Court Lawsuit. ACNA All Saints' and the Diocesan Corporation's attack commenced
on multiple fronts.  First, on September 29, 2021, ACNA All Saints and the Diocesan Corporation
filed a second lawsuit in the 17th Judicial District of Tarrant County, Texas against All Saints (the
"Second State Court Lawsuit") against the Debtor seeking, among other things, the recovery of
property of the Debtor (including the Real Properties, to which ACNA All Saints and the Diocesan
Corporation waived any claim in the First State Court Lawsuit) on the alleged basis of the State
Court Judgment and Judgment Enforcement Order.  Then, roughly one week later, on October 7,
2021, the Diocesan Corporation sent a letter to Frost Bank, the Debtor's bank, in an effort to seize
control of the Debtor's bank accounts. In the letter, the Diocesan Corporation stated that, per the
State Court Judgment and Judgment Enforcement Order, it was "awarded control of all property;
real, personal and financial for the following DBA entities: … All Saints, Fort Worth." Based upon
the Diocesan Corporation's demand, Frost Bank placed an indefinite hold/freeze on all of the
Debtor's accounts on October 15, 2021. Finally, on October 15, 2021, ACNA All Saints and the
Diocesan Corporation filed a new motion with the First State Court to seek, among other things,
the entry of an order (a) requiring the Debtor and Episcopalian All Saints to deliver to the Diocesan
Corporation "all financial statements and audits and bank statements from January of 2009 to the
latest record" and (b) directing the Debtor Episcopalian All Saints to "authorize each financial
institution holding funds in the accounts identified in [the requested] order to deliver those funds
by cashier's check payable to [the Diocesan Corporation]."

4.      **Commencement of the Chapter 11 Case**

Given the inability of the Debtor to access any of its accounts, facing the prospect of having
donor funds seized and misappropriated, and being confronted with the barrage of litigation, the
Debtor's Vestry voted on October 19, 2021 to authorize the Debtor's filing of a petition for relief
under chapter 11 of the Bankruptcy Code.  On October 20, 2021, the Debtor filed a petition for
chapter 11 relief in the Bankruptcy Court, commencing the Chapter 11 Case.

## IV.  **THE DEBTOR'S CHAPTER 11 CASE**

The following is a brief description of certain material events that have occurred or are expected to occur during the Debtor's Chapter 11 Case.

### A.    **First Day Motions**

On or shortly after the Petition Date, in addition to the voluntary petition for relief filed by the Debtor, the Debtor filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief.  A summary of the relief sought pursuant to certain of the First Day Motions is set forth below:

- Cash Management Motion.  Pursuant to the *Debtor's Emergency Motion to Continue Use of Existing Cash Management System, Maintain Existing Bank Accounts, and Related Relief* (the "Cash management Motion") [Docket No. 9], the Debtor requested authority to continue to use its existing cash management system and maintain its existing bank accounts consistent with its prepetition practices.  The Bankruptcy Court granted the Debtor's request by orders dated October 29, 2021 [Docket No. 37], November 17, 2021 [Docket No. 68], January 5, 2022 [Docket No. 133], February 8, 2022 [Docket No. 140], April 11, 2022 [Docket No. 149], and December 27, 2023 [Docket No. 211].  The Cash Management Motion is discussed in further detail below.

- Wage Motion.  Pursuant to the *Debtor's Emergency Motion for Authority to Pay Pre-Petition Employee Wages, Compensation, and Employee Benefits* [Docket No. 10], the Debtor requested authority to pay prepetition employee wages and to continue to provide certain employee benefit programs in the ordinary course of business and consistent with prepetition practices.  The Bankruptcy Court granted the Debtor's request by order dated October 29, 2021 [Docket No. 34].

- Utility Motion.  Pursuant to the *Debtor's Motion for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (ii) Approving Procedures for Providing Adequate Assurance of Post-Petition Payments, and (iii) Approving Debtor's Proposed Form of Adequate Assurance* [Docket No. 11], the Debtor requested authority to provide adequate assurance of payment to utility providers under Section 366 of the Bankruptcy Code.  The Bankruptcy Court granted the Debtor's request by interim and final orders dated October 29, 2021 [Docket No. 35] and November 17, 2021 [Docket No. 69], respectively.

- Neligan Application.  Pursuant to the *Debtor's Application for an Order Authorizing the Retention and Employment of Neligan LLP as Counsel to the Debtor* [Docket No. 15], the Debtor requested authority to retain Neligan LLP as its bankruptcy counsel in the Chapter 11 Case.  The Bankruptcy Court granted the Debtor's request by order dated November 17, 2021 [Docket No. 70].

- <u>NBT Adequate Protection</u>.  Pursuant to the Debtor's Motion for Approval of Adequate Protection Payments to National Bank of Texas [Docket No. 45], the Debtor requested approval of adequate protection payments to NBT in the form of monthly postpetition interest payments on the NBT Secured Claim at the contractual rate of 3.250% per annum.  The Bankruptcy Court granted the Debtor's request by order dated December 3, 2021 [Docket No. 86].

**B.    Claims Process and Bar Date**

**1.    Section 341(a) Meeting of Creditors**

The 341 meeting in these Chapter 11 Case occurred on December 1, 2021.

**2.    Schedules and Statements**

The Debtor filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court on November 17, 2021 and filed amended Schedules on January 4, 2022.

**3.    Bar Date**

On December 16, 2020, the Debtor filed its *Motion for Entry of an Order Establishing Bar Date for Filing Claims and Approving Forms of Notice* [Docket No. 99] (the "<u>Bar Date Motion</u>") seeking (i) the establishment of January 28, 2022 (the "<u>General Bar Date</u>") and 21 days from the date of service of amended schedules as the deadline for Creditors (other than governmental units (as defined under section 101(27) of the Bankruptcy Code)) to file Proofs of Claim in the Chapter 11 Case and (ii) approval of certain notice procedures for notifying Creditors of the General Bar Date.  The Bankruptcy Court granted the Bar Date Motion by order dated December 29, 2021 [Docket No. 126].

On December 29, 2021, the Debtor provided notice of the Claims Bar Date to all known Creditors.  On January 5, 2022, the Debtor to also published notice of the Bar Dates on potential and unknown Creditors in a national circulation of the *New York Times* and in the *Fort Worth Star Telegram*.  The Bankruptcy Court approved such publication as "good, adequate, and sufficient notice of the General Bar Date by publication."  *See* Docket 126, ¶ 6.

**C.    Cash Management Motion**

In the Cash Management Motion, the Debtor sought authority to continue the use of its existing bank accounts and cash management system in the ordinary course of business.  In addition, the Cash Management Motion sought relief requiring Frost Bank to unfreeze the Debtor's bank accounts.  ACNA All Saints objected to the Cash Management Motion asserting, among other things, an interest in the Debtor's bank accounts and financial assets.  *See* Docket No. 24.  As referenced elsewhere in this Disclosure Statement, the Debtor disputed that ACNA All Saints had valid Claim against the Debtor or any interest in the Debtor's assets.  Nonetheless, the parties agreed to the entry of interim orders (i) providing for the Debtor's bank accounts to be unfrozen, (ii) authorizing the Debtor to continue to use those accounts in the ordinary course of business, and (iii) granting ACNA All Saints certain contingent adequate protection solely to the extent ACNA All Saints is adjudicated to have a Claim against or interest in the Debtor's accounts.  Since

-11-

the Petition Date, the Debtor's revenues have exceeded its assets and there has been no diminution in the value of the Debtor's accounts. In connection with the Global Settlement, the Court entered its Second Amended Agreed Final Order Authorizing the Debtor to Continue Use of Existing Cash Management System, Maintain Existing Bank Accounts, and Granting Related Relief [Docket No. 211] on December 27, 2023, unfreezing all of the Debtor's bank accounts and removing any rights and protections granted to ACNA All Saints and the Diocesan Corporation in the Debtor's cash and accounts.

## D.   Motion to Dismiss

On November 4, 2021, ACNA All Saints and the Diocesan Corporation filed a motion seeking dismissal of the Chapter 11 Case under section 1112(b) of the Bankruptcy Code (the "Motion to Dismiss") [Docket No. 46], asserting that the Debtor's Vestry lacked the authority under the Debtor's corporate governance documents to authorize a bankruptcy filing.  Thereafter, the Debtor, ACNA All Saints, and the Diocesan Corporation engaged in discovery related to the issues raised in the Motion to Dismiss, including the issue of who properly controls the Debtor corporation.  The Bankruptcy Court conducted a hearing on the Motion to Dismiss on November 30, 2021.  The Bankruptcy Court denied the Motion to Dismiss by order dated December 15, 2021.  *See* Docket No. 97.  On December 29, 2021, the Bankruptcy Court issued a Memorandum Opinion explaining the reasoning for denying the Motion to Dismiss.  The Bankruptcy Court found, among other things, that upon leaving the Debtor's congregation, the members of ACNA All Saints "relinquished their right to have any continuing involvement in the affairs of . . . the Debtor" and concluded that the Chapter 11 Case "was authorized by the duly and lawfully elected members of the Debtor's Vestry."

## E.   Motion for Leave to Appeal and Subsequent Motions to Dismiss

On December 21, 2021, ACNA All Saints and the Diocesan Corporation filed a Motion for Leave to Appeal (the "Motion for Leave") [Docket No. 104] seeking authority from the United States District Court for the Northern District of Texas (the "District Court") under 28 U.S.C § 158(a)(3) to file an interlocutory appeal of the Bankruptcy Court's order denying the Motion to Dismiss.  The Motion for Leave was docketed in the District Court under Case No. 4:21-cv-01366-P.  The District Court denied the Motion for Leave, and a subsequent request for reconsideration, in the Spring of 2022.  After the Motion for Leave was denied, ACNA All Saints filed two subsequent motions seeking dismissal of the Chapter 11 Case under section 1112(b) of the Bankruptcy Code.  Docket Nos. 152, 180.  Each motion was denied by the Bankruptcy Court. Docket Nos. 164, 191.

## F.   Adversary Proceeding

On December 16, 2021, the Debtor initiated the Adversary Proceeding by filing an adversary complaint against ACNA All Saints and the Diocesan Corporation (the "Defendants") in the Bankruptcy Court requesting, among other things, a declaration regarding the ownership of certain Estate property.  Specifically, the Debtor requested a declaration from the Bankruptcy Court under 28 U.S.C. § 2201 that it owned the four real properties, financial assets, and intellectual property the Defendants attempted to seize prior to the Chapter 11 Case.  On January 14, 2022, the Defendants filed an answer and counterclaims in the Adversary Proceeding seeking

a declaration from the Bankruptcy Court that the Defendants own the property at issue in the Adversary Proceeding.  The Adversary Proceeding was scheduled for trial in the fall of 2023.

**G.**     **ACNA All Saints Claim**

On January 28, 2022, ACNA All Saints and the Diocesan Corporation filed Proof of Claim No. 7 in the Chapter 11 Case asserting a Claim against the Debtor in the amount of $7,697,549.80, allegedly based on the State Court Judgment, the claims in First State Court Lawsuit, and "vestry and membership in All Saints' Episcopal School of Fort Worth, a non-profit corporation."  ACNA All Saints and the Diocesan Corporation asserted that the ACNA All Saints Claim is secured by a lien on property having a value of $5,158,749.80.  The Debtor disputed that ACNA All Saints and the Diocesan Corporation had any allowable Claim against, or interest in, the Debtor's Estate and objected to the Proof of Claim in the Adversary Proceeding.

**H.**     **Global Settlement**

Shortly before trial in the Adversary Proceeding, the Debtor, ACNA All Saints, and the Diocesan Corporation reached an agreement to fully settle and resolve all claims arising from or related to EDFW's departure from the Episcopal Church, including but not limited to the claims asserted in the Adversary Proceeding and the ACNA All Saints Claim.  The general terms of the Global Settlement, which were documented in the Settlement Agreement among the parties, were as follows:

- Defendants received legal and equitable title to the real properties located at 5001 and 5005 Dexter Avenue, Fort Worth, Texas 76107.
- The Debtor received legal and equitable title to the real properties located at 4936 and 4939 Dexter Avenue.
- Defendants received the Permanent Endowment Fund.
- Defendants received the $100,000 supersedeas bond from the registry of the State Court.
- The Debtor retained all other financial assets and property that it currently owns and controls, whether existing in the past, present or future.
- The Defendants retained the assets surrendered prior to the Chapter 11 Case by the unincorporated parish affiliated with the Debtor.
- The ACNA All Saints Claim is disallowed by the Bankruptcy Court and the Defendants shall not oppose the Debtor's Plan of Reorganization or file any other pleadings or proofs of claim in the Bankruptcy Case.
- The Debtor has the exclusive right to use the name "All Saints Episcopal Church" and/or "All Saints' Episcopal Church." Defendants shall no longer use that name and shall change their name to "All Saints Anglican Church" or "All Saints' Anglican Church."
- All Saints Episcopal School ("ASES") shall continue to be governed and controlled solely by the Debtor and its vestry in accordance with the Debtor's and ASES's applicable governance documents.  Defendants release any and all claims related to ASES and shall have no right to participate in the control or governance of ASES now or in the future.
- The Parties mutually release one another from all claims asserted or which could

Case 21-42461-elm11   Doc 215   Filed 01/31/24   Entered 01/31/24 12:38:57   Desc
Main Document    Page 20 of 40

have been asserted in the Adversary Proceedings related in any way to the separation of the Episcopal Diocese of Fort Worth from the Episcopal Church, the departure of certain member of All Saints Episcopal Church and the formation of Defendant ACNA All Saints, the real properties or financial assets owned by the Debtor, any other real or personal property or financial assets of the Debtor or Defendants currently owned or hereafter acquired by the Debtor or Defendants, or Defendant's Proof of Claim.

- All litigation in state or federal court between the parties shall be dismissed with prejudice.
- The Adversary Proceeding shall be concluded by the entry of an Agreed Final Judgment.
- Each Party and its principals shall not disparage the other Party or its principals.
- The Parties shall each bear their own attorneys' fees and costs.

The Bankruptcy Court approved the Global Settlement and the Settlement Agreement by entering the Settlement Order on December 15, 2023 [Docket No. 209].  The Bankruptcy Court entered the Final Judgment implementing the terms of the Global Settlement, disallowing the ACNA All Saints Claim, and dismissing the Adversary Proceeding on December 18, 2023.  Adv. Pro. Docket No. 182.  After execution and entry of the Settlement Documents, the Debtor consummated the Global Settlement by, among other things, transferring the Permanent Endowment and real properties located at 5001 Dexter Avenue and 5005 Dexter Avenue, Fort Worth, Texas 76107 to the Defendants.

The Global Settlement and Settlement Documents are incorporated into and made part of the Plan.  Plan at Art. VIII(H).

## V.  **SUMMARY OF THE PLAN**

### A.   **Overview**

Articles III and IV of the Plan describe the classification and treatment of Claims under the Plan.  Article VI of the Plan sets forth procedures governing Distributions under the Plan.  Article VII contains procedures for resolving contingent, unliquidated and disputed Claims.  Article VIII of the Plan describes the means for implementation of the Plan.  Article IX of the Plan contains settlement, release, exculpation, and injunction provisions.  Article X sets forth procedures governing the treatment of Executory Contracts and Unexpired Leases under the Plan. Article XI sets forth the conditions precedent to the effectiveness of the Plan.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against the Debtor under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against the

Debtor, the Debtor's Estate, the Reorganized Debtor, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

**B.**      **Classification and Treatment of Claims**

Consistent with section 1122 of the Bankruptcy Code, Article III of the Plan designates the Classes of Claims identified below. The Plan provides that a Claim is placed in a particular Class for the purposes of voting on the Plan and will receive distributions pursuant to the Plan only to the extent that such Claim has not been paid, released, withdrawn or otherwise been settled before the Effective Date of the Plan.  The Plan also provides the Debtor may not have Holders of Claims in a particular Class or Classes, and such Classes shall be deemed eliminated for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Article IV of the Plan governs the treatment of Claims under the Plan.  The classification and treatment of Claims against the Debtor pursuant to the Plan is as follows:[5]

| Class | Voting Rights / Treatment |
|---|---|
| Class 1 – NBT Secured Claim<br><br>Estimated Number:  1<br>Estimated Amount:  $100,000<br>Estimated Recovery:  100% | Unimpaired – Not Entitled to Vote<br><br>In full satisfaction of the NBT Secured Claim, the NBT Secured Claim shall be reinstated under the terms of the NBT Loan Documents and shall be paid by the Reorganized Debtor in accordance with the NBT Loan Documents.  The NBT Secured Claim shall survive the Effective Date and shall not be discharged, modified, or otherwise impaired or altered by this Plan.   For the avoidance of doubt, NBT's legal, equitable, and contractual rights with respect to the NBT Secured Claim shall be unaltered by this Plan. To the extent that the NBT Loan Documents constitute Executory Contracts, the NBT Loan Documents shall be assumed under this Plan.   Until such time as the NBT Secured Claim is paid in full, NBT shall retain the NBT Liens, which shall remain in place in accordance with the NBT Loan Documents and applicable state law. |
| Class 2 – Miscellaneous Secured Claims<br><br>Estimated Number:  0 | Unimpaired – Not Entitled to Vote / Deemed to Accept |

---

[5] The recoveries described in this Disclosure Statement that are available to the Holders of Claims are estimates and actual recoveries that could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided herein.

| | |
|---|---|
| Estimated Amount: $0<br>Estimated Recovery: 100% | On or as soon as practicable after the later of (a) the Effective Date, or (b) the Allowance Date with respect to a Miscellaneous Secured Claim, each Holder of a Miscellaneous Secured Claim shall receive from the Reorganized Debtor, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, either (i) Cash in the Allowed Amount of such Claim, (ii) the return of the Collateral securing such Claim, or (iii) such other, less favorable treatment to which such Holder and the Debtor or the Reorganized Debtor, as applicable, agree to in writing.  Nothing in this Plan shall be construed as a limitation on, or waiver of, any party's right to object to the Allowance of a Miscellaneous Secured Claim under section 502(a) of the Bankruptcy Code or otherwise. |
| Class 3 – Other Priority Claims<br><br>Estimated Number:  0<br>Estimated Amount:  $0<br>Estimated Recovery:  100% | Unimpaired – Not Entitled to Vote / Deemed to Accept<br><br>On or as soon as practicable after the later of (a) the Effective Date, or (b) the Allowance Date with respect to an Other Priority Claim, to the extent such Other Priority Claim has not already been satisfied by payments made pursuant to an order of the Bankruptcy Court, each Holder of an Other Priority Claim shall receive from the Reorganized Debtor, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, either (i) Cash in the Allowed Amount of such Claim, or (ii) such other, less favorable treatment to which such Holder and the Debtor or the Reorganized Debtor, as applicable, agree to in writing. |
| Class 4 – General Unsecured Claims<br><br>Estimated Number:  50<br>Estimated Amount:  $330,000<br>Estimated Recovery:  100% | Impaired – Entitled to Vote<br><br>On or before the later of (a) the date that is twenty-four (24) months after the Effective Date, or (b) the date that is thirty (30) days after the Allowance Date with respect to a General Unsecured Claim, each Holder of a General Unsecured Claim shall receive from the Reorganized Debtor, in full satisfaction, settlement, release and discharge of and in exchange for such Claim, either (i) Cash in the Allowed Amount of such Claim, or (ii) such other, less favorable treatment to which such Holder and the Debtor or the Reorganized Debtor, as applicable, agree to in writing. |
| Class 5 – ACNA All Saints Claim | Disallowed – Not Entitled to Vote |

| Estimated Number:  1 Estimated Amount:  n/a Estimated Recovery:  n/a | Holders of the ACNA All Saints Claim shall not be entitled to, and shall not receive, any distribution under the Plan. |
|---|---|

**C.**     **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

Article VII of the Plan establishes procedures for resolving contingent, unliquidated, and disputed claims.  The Plan provides that the Reorganized Debtor has the sole authority to object to Claims on or before the Claims Objection Deadline, which the Plan establishes as 90 days after the Effective Date of the Plan.  Article X also contains provisions governing the estimation of claims under section 502(c) of the Bankruptcy Code.

**D.**     **Means for Implementation of the Plan**

Article VIII of the Plan sets forth the means for implementation of the Plan, including, but not limited to the sources of consideration for Distributions under the Plan.  The Debtor and Reorganized Debtor shall fund Distributions under the Plan with Unrestricted Assets and current revenue generated by the Debtor after the Petition Date.  In the Debtor's and Reorganized Debtor's sole discretion, Restricted Assets may be used to fund Distributions under the Plan to the extent such Distributions are consistent with all restrictions on use of such Restricted Assets and applicable law.

**E.**     **Settlement, Release, Injunction, and Related Provisions**

Article IX of the Plan contains provisions for the compromise, settlement, release, exculpation and injunction of Claims against the Debtor and certain third parties.  Among other things, Article IX of the Plan provides as follows:

      **1.**     **Compromise and Settlement of Claims, Equity Interests, and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made on account of such Allowed Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against the Debtor and the Estate and Causes of Action (including Avoidance Actions) against other Entities.

2.      **Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and causes of action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, or rights against the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any liability to the extent such Claims relate to services performed by employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The foregoing applies in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim based upon such debt, right, is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim has accepted the Plan.  Any default or "event of default" by the Debtor with respect to any Claim that existed immediately before or on account of the Filing of the Chapter 11 Case shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  Subject to the terms and conditions of the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date.

3.      **Exculpation**

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASE, IN WHOLE OR IN PART, THE DEBTOR, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING THE PLAN, THE DISCLOSURE STATEMENT, OR THE SETTLEMENT DOCUMENTS, ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD OR WILLFUL MISCONDUCT.  THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL**

BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.    NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NO EXCULPATION SHALL BE GIVEN IN CONTRAVENTION OF *NEXPOINT ADVISORS, L.P. V. HIGHLAND CAPITAL MGMT., L.P. (IN RE HIGHLAND CAPITAL MGMT., L.P.)*, 48 F.4TH 419 (5TH CIR. 2022).

4.    <u>Injunction</u>

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS THAT HAVE BEEN DISCHARGED PURSUANT TO THE SETTLEMENT DOCUMENTS OR PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, REORGANIZED DEBTOR, AND THE EXCULPATED PARTIES:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, OR IN CONNECTION WITH, OR WITH RESPECT TO, ANY SUCH CLAIMS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER, AGAINST SUCH ENTITIES ON ACCOUNT OF, OR IN CONNECTION WITH, OR WITH RESPECT TO, ANY SUCH CLAIMS; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF, OR IN CONNECTION WITH, OR WITH RESPECT TO, ANY SUCH CLAIMS; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF, OR IN CONNECTION WITH, OR WITH RESPECT TO, ANY SUCH CLAIMS UNLESS SUCH ENTITY HAS EITHER (1) TIMELY FILED A PROOF OF CLAIM ASSERTING A RIGHT OF SETOFF OR RECOUPMENT, OR (2) TIMELY ASSERTED SUCH SETOFF OR RECOUPMENT RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR RECOUPMENT, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR RECOUPMENT PURSUANT TO APPLICABLE LAW OR OTHERWISE; (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS TREATED, DISCHARGED, EXCULPATED, OR SETTLED PURSUANT TO THE SETTLEMENT DOCUMENTS OR PLAN; OR (F) TAKING ANY ACTION TO

**INTERFERE WITH THE IMPLEMENTATION OF THE TERMS OF SETTLEMENT DOCUMENTS AND PLAN.**

**F.      Treatment of Executory Contracts and Unexpired Leases**

The Plan provides for treatment of Executory Contracts and Unexpired Leases.  Article X of the Plan contains provisions governing treatment of Executory Contracts and Unexpired Leases, including provisions related to the assumption or rejection of Executory Contracts and Unexpired Leases.  The Plan generally provides that, on the Effective Date, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected shall be assumed by the Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

**This Disclosure Statement constitutes notice to all affected parties that the proposed cure amount for each Executory Contract or Unexpired Lease is $0.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment or related cure amount must be Filed, served and actually received by the Debtor on or before seven (7) days prior to the Confirmation Hearing.**

**G.      Conditions Precedent to Confirmation and Consummation of the Plan**

The Plan provides certain conditions precedent to the Effective Date. It is a condition to Consummation of the Plan that the conditions set forth in Article XI of the Plan have been satisfied or have occurred in conjunction with the occurrence of the Effective Date (or waived pursuant to Article XI(B) of the Plan). Entry of the Confirmation Order alone is not sufficient to ensure Consummation of the Plan.

**VI.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the confirmation process related to the Plan. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary included in this Disclosure Statement.

**A.      Confirmation Hearing**

The Confirmation Hearing to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code is scheduled for **[_____] at [_____] (Central Time)**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

**B.      Procedure for Objections**

Responses and objections, if any, to the Plan must be Filed with the Court and served so as to be actually received by the Debtor on or before **[_____] at 5:00 p.m. (Central Time)**. Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

## C.    Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that the Debtor has complied, or will have complied with, all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtor believes that the Plan satisfies, or will satisfy, the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made, or to be made, under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been, or will be, disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed until after Confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than thirty (30) days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash or deferred payments in Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable); and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim Cash or regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal

to the Allowed amount of such Claim over a period ending not later than five (5) years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtor has paid, or the Plan provides for the payment of, the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- The Plan provides for the continuation of payment of all retiree benefits owed by the Debtor as that term is defined in section 1114 pf the Bankruptcy Code.

- All transfers of property under the Plan will be made in accordance with applicable nonbankruptcy law governing nonprofit businesses.

## D.   <u>Exculpation and Injunctions Provisions</u>

Article IX of the Plan provides for the exculpation and release of each Exculpated Party for acts or omissions taken in connection with the Chapter 11 Case. The Exculpated Parties include: (a) the Debtor; (b) the Reorganized Debtor; and (c) with respect to each of the foregoing Entities in clauses (a) through (b), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

All of the Exculpated Parties are being exculpated and released because the Debtor has decided in its business judgment that they have made substantial and valuable contributions to the Debtor's restructuring efforts through considerable efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Moreover, the exculpation provisions are appropriately limited to the Exculpated Parties' participation in the Chapter 11 Case and have no effect on liability resulting from actual fraud, gross negligence, or willful misconduct. Accordingly, each of the Exculpated Parties is deserving of the benefits of the release and exculpation provisions.

Based on the foregoing, the Debtor believes that the exculpation and releases contained in the Plan are necessary and appropriate and meet the requisite legal standard. The Debtor will demonstrate at the exculpation and releases in the Plan are fair, equitable, in the best interest of the Debtor's estate, and a reasonable and valid exercise of the Debtor's business judgment.

**E.      Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in such Class.  The Plan creates separate Classes to deal with the NBT Secured Claim, Miscellaneous Secured Claims, Other Priority Claims, General Unsecured Claims, and the ACNA All Saints Claim.  The Debtor believes the Claims contained in each Class are substantially similar to all other Claims in the same Class, and thus the Plan meets the requirements of section 1122 of the Bankruptcy Code.

**F.      Impaired Claims**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of the Claims in such Class.  The Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  The Holders of Claims in any Class which will not receive any payment or Distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote.

**G.      Disclosure of Officers and Directors of the Reorganized Debtor**

Section 1129(a)(5) of the Bankruptcy Code requires that the proponent of a plan of reorganization disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer of the reorganized debtor.  Article VIII(D) of the Plan provides that, unless an officer or director of the Debtor resigns prior to the Effective Date, which vacancy shall be filled in accordance with the Debtor's articles or certificate of incorporation and bylaws, the officers and directors of the Debtor as of the Effective Date shall serve as the officers and directors of the Reorganized Debtor.  For the avoidance of doubt, the information required by section 1129(a)(5) of the Bankruptcy Code, including the identities and affiliations of the directors and officers of Reorganized Debtor, shall be contained a notice filed with the Bankruptcy Court prior to the Confirmation Hearing.[6]  The Debtor will demonstrate at the Confirmation Hearing that appointment to, or continuance in, such office by such individuals is consistent with the interests of creditors and with public policy.  The Debtor therefore believes that the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code

**H.      Best Interests of Creditors Test—Liquidation Analysis**

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each Holder of a Claim in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the

---

[6] Annual elections to the Debtor's Vestry will occur between the date of this Disclosure Statement and the Confirmation Hearing.  Thus, the identity of the members of the Debtor's leadership may change between the date of this Disclosure Statement and the Confirmation Hearing.  Accordingly, the Debtor will disclose the information required under section 1129(a)(5) after the annual elections but prior to the Confirmation Hearing.

debtor liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "best interest of creditors" test because it provides Holders of Claims with a recovery of at least as much as they would receive in a hypothetical liquidation. The following liquidation analysis supports the Debtor's conclusion:

| Liquidation Analysis | Estimated Value | Estimated Liquidation Value |
|---|---|---|
| Unrestricted Cash | $ 147,054 | $ 147,054 |
| Real Property | 1,490,000 | 1,341,000[7] |
| **Total Assets at Liquidation Value** | | **$1,488,054** |
| **Estimated Administrative Expenses and Secured Claims** | | |
| Estimated Debtor's Counsel Fees & Expenses | | 1,200,000[8] |
| Estimated Chapter 7 Trustee Fees | | 71,000 |
| NBT Secured Claim | | 100,000 |
| **Total Administrative and Secured Claims** | | **$1,371,000** |
| **Funds Available for Distribution to General Unsecured Creditors** | | **$117,054** |
| **Estimated Distribution to General Unsecured Creditors in Liquidation** | | **35%** |
| **Estimated Distribution to General Unsecured Creditors Under the Plan** | | **100%** |

To calculate the probable distribution to Holders of each Impaired Class of Claims and interests if the Debtor were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Debtor were in a case under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtor's assets by a chapter 7 trustee. The amount of liquidation value available to unsecured creditors and interest holders would be reduced by the Claims of any Secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the

---

[7] Assumes 10% transaction costs.
[8] Assumes no voluntary discount by Neligan LLP.

compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in the Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and any Claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case.  Once the Bankruptcy Court ascertains the recoveries in liquidation of Secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution is equal to or less than the distributions to be received by such creditors and equity security holders under the plan, then the plan satisfies the best interests of creditors test.

The Plan provides recoveries to, among others, the Holders of Claims in Classes 1 through 4.  The estimated recoveries for each of those Classes is set forth in Article V of this Disclosure Statement.  As demonstrated in the Liquidation Analysis set forth above, such recoveries are higher than recoveries estimated to be available if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Debtor therefore believes that the Plan complies with the "best interests" test of section 1129(a)(7).

I.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless the plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet the obligations under the Plan. Based on this analysis, the Debtor believes the Plan meets the financial feasibility requirement.  Moreover, the Debtor believes that sufficient funds will exist to make all payments required by the Plan.  Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

J.    **Eligibility to Vote on the Plan**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Class 4 may vote on the Plan.

K.    **Solicitation and Confirmation Notice**

The Solicitation and voting procedures are set forth in Article II of this Disclosure Statement.  All Holders of Claims in Class 4 will receive notice of the confirmation hearing on the Plan and a form of Ballot.  All other Creditors and parties in interest not entitled to vote on the Plan will only receive notice of the Confirmation Hearing and a notice of non-voting status.

VII.  **CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's business or the Plan and its implementation.

## A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes of Claims in each Class are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties in interest will not object to the classification of Claims and Interests under the Plan.

### 2.    The Debtor May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. However, there is no guarantee that enough Holders of Claims entitled to vote to accept or reject the Plan will vote to accept the Plan.  In the event that the Debtor does not obtain sufficient votes to confirm the Plan, the Debtor may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 3.    The Debtor May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

As noted above, there can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Plan or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Plan, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize its

business and what Holders of Allowed Claims would ultimately receive on account of such Allowed Claims.

**4.      Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**5.      Termination of Exclusivity**

Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court, or it may expire under the applicable provisions of the Bankruptcy Code. Because exclusivity has expired in this case, other parties in interest have the opportunity to propose alternative plans of reorganization. If other parties in interest were to propose an alternative plan of reorganization, such a plan may be less favorable to the Debtor, its Estate, and stakeholders. In addition, if there were competing plans of reorganization, the Chapter 11 Case would likely become longer, more complicated, and more expensive, thereby reducing recoveries to Creditors.

**6.      Exculpation and Injunction Provisions May Not Be Approved**

Article IX of the Plan provides for certain exculpations and injunctions, including a release of claims and liens that may otherwise be asserted against the Debtor, Reorganized Debtor, or Exculpated Parties, as applicable.  The exculpations and injunctions (including, for the avoidance of doubt, the definition of Exculpated Parties) provided in the Plan could be subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Exculpated Parties.

**7.      The Conditions Precedent to the Effective Date of the Plan May Not Occur**

The Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date of the Plan will not occur.

**8.      Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date of the Plan will, in fact, occur and, if so, when.

9. **The Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Plan cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Plan.

10. **Recovery to Holders of Allowed Claims Cannot be Stated with Certainty**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The estimated Claims and Creditor recoveries under the Plan are based on various assumptions, and the actual Allowed amounts of Claims may significantly and materially differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in the Plan. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

11. **Amendment of the Plan Prior to Confirmation by the Debtor**

The Debtor, subject to the terms and conditions of the Bankruptcy Code, reserves the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for confirmation. The potential impact of any such amendment or waiver on holders of Claims cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

12. **Dismissal of Chapter 11 Case**

If the Plan is not confirmed, the Debtor or other parties in interests may seek dismissal of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code. Dismissal of the Chapter 11 Case would terminate the automatic stay and allow certain creditors to initiate or continue litigation against the Debtor or take other action to pursue their Claims against the Debtor. Dismissal of the Chapter 11 Case could therefore threaten the Debtor's ability to continue operating as a going concern.

B. **Risks Related to the Debtor's and Reorganized Debtor's Operations**

1. **Economic Recession and Effects of COVID-19 Pandemic**

The COVID-19 pandemic has presented issues and caused disruptions to the Debtor's operations. Beginning in late February 2020, the Debtor began to face unprecedented operational challenges associated with the spread of COVID-19 in the United States. As the pandemic spread through North America, the Debtor were forced to temporarily cease in-person services, consistent with governmental health guidelines and directives. The Debtor's inability to conduct in-person

services limited opportunities for outreach to the Debtor's members and the general public, which in turn reduced the Debtor's operating revenue.

The continued spread of COVID-19 could have a significant impact on the Debtor's activities and operations in the future. It remains unclear what restrictions could be imposed on the Debtor's operations in response to the pandemic, and such restrictions could bar or limit the Debtor from engaging in fundamental activities essential to the Debtor's religious and charitable mission. Moreover, the health, social, and economic impact the pandemic will have in the future is unknown. As such, there can be no assurance that the uncertainties caused by the spread of COVID-19 will not negatively impact the Debtor in the future and, therefore, affect the underlying financial projections contained in this Disclosure Statement.

### 2. The Debtor May Not Achieve its Projected Financial Results

The Debtor's ability to make the require distributions under the Plan are premised, in part, upon its future financial results. The Plan is based upon the Debtor's leadership's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtor's operations. While the Debtor believes that its estimate of its future financial results is reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control. If the Debtor does not achieve these projected financial results the value of the Reorganized Debtor may be negatively affected, and the Reorganized Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date. Further, the Debtor may not have sufficient liquidity to make the Distributions Provided for under the Plan. Moreover, the financial condition and results of operations of the Reorganized Debtor, from and after the Effective Date of the Plan, may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

### 3. The Debtor May Not Be Able to Generate Sufficient Cash to Service All of its Indebtedness

As of the Effective Date, the Reorganized Debtor will be subject to secured debt owed to NBT. The Reorganized Debtor's ability to make scheduled payments on or refinance such debt obligations depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, political, social, and other conditions beyond the Reorganized Debtor's control. The Reorganized Debtor may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtor to pay the principal, premium, if any, and interest on future indebtedness.

### 4. Risks and Uncertainties Associated with the Chapter 11 Case

For the duration of the Chapter 11 Case, the Debtor's ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include, but are not limited to the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Case from time to time; (c) ability to maintain

relationships with suppliers, service providers, parishioners, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtor's operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtor; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtor to propose and confirm a chapter 11 plan; and (g) the actions and decisions of the Debtor's creditors and other third parties who have interests in the Chapter 11 Case that may be inconsistent with the Debtor's plans.

These risks and uncertainties could affect the Debtor's operations in various ways.  For example, negative events associated with the Chapter 11 Case could adversely affect the Debtor's ability to raise funds and attract new members.  Also, the Debtor will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtor's ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Case, the Debtor cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Case, but they could have a materially adverse impact on the Debtor's operations.

## 5.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtor

The Debtor's future financial results may be dependent upon the successful confirmation and implementation of a plan of reorganization in the Chapter 11 Case.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtor's business, financial condition, reputation, and liquidity.  So long as the Chapter 11 Case continues, the Debtor's leadership will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on the Debtor's operations and core missions. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's operations.  In addition, the longer the Chapter 11 Case continues, the more likely it is that parishioners, donors, and members might lose confidence in the Debtor's ability to reorganize successfully.  So long as the Chapter 11 Case continues, the Debtor will incur substantial costs for Professional fees and other expenses associated with the administration of the Chapter 11 Case.

## 6.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtor's operations are dependent on certain key leadership.  It is possible that the Debtor could lose or experience a change in leadership and certain key personnel during or after the Chapter 11 Case.  For example, the Debtor's long-time Rector and Business Manager recently retired.  The loss of such key personnel could adversely affect the Debtor's or Reorganized Debtor's operations and financial results.  In addition, a loss of key personnel could have a material adverse effect on the Debtor's or Reorganized Debtor's ability to serve its core mission, thereby adversely affecting the Debtor's ability to raise funds and attract new members.

## 7.      Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims

that arise prior to the Debtor's filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization, and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the Reorganized Debtor and may have an adverse effect on the Reorganized Debtor's financial condition and results of operations on a post-reorganization basis.

## C.   Risks Associated with Forward Looking Statements

The Plan contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision", "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology. The Debtor has based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtor believes these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Plan has not been audited**. In preparing the Plan, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtor has used reasonable business judgment to ensure the accuracy of the financial information provided in this Plan, and while the Debtor believes that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to represent or warrant that the financial information contained in this Plan and attached hereto is without inaccuracies.

## D.   Plan Disclaimer

### 1.   Information Contained in this Disclosure Statement and the Plan is for Soliciting Votes

The information contained in this Disclosure Statement and the Plan is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 2.   No Legal, Business, Accounting, or Tax Advice Is Provided to You by the Plan

**Neither this Disclosure Statement nor the Plan is advice to you.** The contents of this Disclosure Statement Plan should not be construed as legal, business, accounting, or tax advice. Each Holder of a Claim should consult such Holder's own respective legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest. The Plan may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

3.      **No Admissions Made**

The information and statements contained in the Plan will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtor), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, or Holders of Allowed Claims, or any other parties in interest.

4.      **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in the Plan. The Debtor or Reorganized Debtor, as applicable, may seek to investigate, File, and prosecute Causes of Action, and may object to Claims after the confirmation or Effective Date of the Plan irrespective of whether the Plan identifies such Causes of Action or objections to such Claims.

5.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of a Claim, for or against the Plan, does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtor (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate or the Reorganized Debtor are specifically or generally identified in the Plan.

6.      **Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors**

The Debtor's advisors have relied upon information provided by the Debtor in connection with the preparation of the Plan.  Although the Debtor's advisors have performed certain limited due diligence in connection with the preparation of the Plan, they have not verified independently the information contained in the Plan.

7.      **Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update**

The statements contained in the Plan are made by the Debtor as of the date of the Plan, unless otherwise specified in the Plan, and the delivery of the Plan after the date of the Plan does not imply that there has not been a change in the information set forth in the Plan since that date. While the Debtor has used reasonable business judgment to ensure the accuracy of all of the information provided in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in the Plan.  Further, although the Debtor may subsequently update the information in the Plan, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

8.      **No Representations Outside the Plan and Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtor, the Chapter 11 Cases, or this Disclosure Statement and the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement and the Plan. Any representations or

inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, the Plan, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## VIII. [RESERVED]

## IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and consummation of the Plan may have tax consequences to Holders of Claims.  The Debtor does not offer an opinion as to any federal, state, local, foreign, or other tax consequences to Holders of Claims as a result of the confirmation of the Plan.  All Holders of Claims are urged to consult with their own tax advisors to ascertain the federal, state, local, foreign or other tax consequences of the Plan.  This Plan is not intended, and should not be construed, as legal or tax advice to any Creditor or any other party in interest.

## X. RECOMMENDATION OF THE DEBTOR

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to Creditors than would otherwise result in any other scenario. Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[remainder of page intentionally left blank]*

Dated:  January 31, 2024

ALL SAINTS EPISCOPAL CHURCH
a Texas Nonprofit Corporation


By:    */s/Stephanie Burk*                    
       Stephanie Burk
       Senior Warden

.

91130v.3